## SMITH v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION.

## CATZ AMERICAN SHIPPING CO. v. SAME.

(District Court, S. D. New York. July 10, 1924.)

1. **Shipping �köö125—Vessel held to have deviated from advertised route.**

Vessel advertised as destined for "Cardiff, Rotterdam, and Hamburg," which, though carrying cargo for Rotterdam, passed entrance to that port and proceeded with intent to go to Hamburg and return to Rotterdam, *held* to have deviated, notwithstanding permission in bill of lading for it "to touch at any port or ports in any rotation or order in or out of the customary route"; such language relating only to ports on way to Rotterdam, either in or out of geographical order.

2. **Customs and usages �köö3—Custom, to acquire force of law, must be general and uniform, and peaceably acquiesced in for long time.**

Custom or usage, to acquire force of law, must be general and uniform in business affected, and have been peaceably acquiesced in for long time.

3. **Customs and usages �köö3—General or uniform custom, having force of law, of which shippers should take notice, held not established.**

A business usage whereby no more than 18 ships at most controlled by libelee had proceeded from Pacific Coast to Hamburg before discharging at Rotterdam, which practice had only been pursued for a period of about a year, *held* insufficient to constitute a general and uniform custom, having force of law, of which shippers should take notice.

4. **United States �köö52½, New, vol. 19A Key-No. Series—Emergency Fleet Corporation held liable for losses from unauthorized deviation, though bills of lading signed by agent.**

Emergency Fleet Corporation *held* liable for losses from unauthorized deviation, though bills of lading covering lost cargo were merely signed by independent firm as agents of Emergency Fleet Corporation, which was but agent for the United States.

5. **Action �köö35—Shippers' statutory remedy in personam against the United States in place of one in rem against government-owned vessel is not exclusive.**

Act March 9, 1920 (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼*l*), designed to furnish shippers a remedy in personam against the United States in place of one in rem against a government-owned vessel employed in the merchant service, does not create an exclusive remedy, and shipper sustaining loss from unauthorized deviation may proceed either by suit in admiralty or at common law against Emergency Fleet Corporation.

In Admiralty. Separate libels in personam by Jacob Telfair Smith and by the Catz American Shipping Company against the United States Shipping Board Emergency Fleet Corporation. Interlocutory decrees for libelants granted.

Barry, Wainwright, Thacher & Symmers, of New York City (John C. Prizer, of New York City, of counsel), for libelants.

Burlingham, Veeder, Masten & Fearey, of New York City (Ray Rood Allen, Glenn R. Snider, and William J. Dean, all of New York City, of counsel), for respondent.

AUGUSTUS N. HAND, District Judge. These are libels brought in personam against the Emergency Fleet Corporation for damages to cargo arising from an alleged deviation of the steamship West Aleta. The vessel stranded upon the coast of Holland on or about February 12, 1920, after she had passed the port of Rotterdam, to which the goods were consigned. The cargo shipped by Jacob Telfair Smith was bean oil, alleged to have been of the value of $155,000, and the cargo shipped by Catz American Company, Inc., was rice and nutmegs, of the value of $34,000.

The bill of lading covering the goods of each libelant allowed the vessel "to touch at any port or ports in any rotation or order in or out of the customary route and to call at any port or ports more than once unto the port of Rotterdam." The goods were shipped from ports on the Pacific in Washington or San Francisco, and there is no question that the vessel proceeded pursuant to the instructions of the respondent's operators and managers, passed through the English Channel by the entrance to Rotterdam, and proceeded on with the intention of going to Hamburg, and of subsequently returning to Rotterdam after discharging cargo at Hamburg.

There was a dispute in the testimony as to whether the voyage beyond Rotterdam to Hamburg, at the mouth of the Elbe, was less safe on account of floating mines than the prior part of the voyage. But the high insurance rates charged for shipments of goods to Hamburg indicate that there was at least thought to be serious danger from mines on a voyage between Rotterdam and Hamburg. Moreover, the extended route would increase the risk, even though there was as much danger between Dover and Rotterdam as between Rotterdam and Hamburg, simply because the risk would be prolonged.

There was evidence that the ship was advertised in the San Francisco Guide as destined for "Hamburg, Rotterdam, and Cardiff," in that order, and in the Seattle Index the advertisement gave the order as "Cardiff, Rotterdam, and Hamburg." The goods of the Catz American Company were shipped at San Francisco, and those of Jacob Telfair Smith at Seattle. It was proved that the usual course of a large number of

vessels managed at this time by Williams, Dimond & Co. was to go first to Hamburg, and proceed thence to Rotterdam. One of the reasons for doing this was that the vessels did not wish to shop at Rotterdam twice, and the east-bound cargo for Rotterdam was likely to be much smaller than the west-bound cargo, so that, if the vessel was heavily laden, such cargo as might be discharged at Rotterdam would not leave room enough on the ship for the merchandise that was to be taken back on the westward voyage. Another reason for proceeding first to Hamburg was that the Hamburg cargo was stowed on top, whereas wine, brandy, and bean oil, for Rotterdam and Cardiff, were stowed in the vessel's lower holds.

The bill of lading contained the usual exceptions that the carrier should "not be liable for loss or damage occasioned by causes beyond its control, or by the perils of the seas or other waters, * * * stranding, or other accidents of navigation of whatsoever kind. * * *"

The libelants insist that the exceptions in the bill of lading were nullified by a deviation of the West Aleta. To this the respondent answers: (a) That the West Aleta did not deviate; (b) that in any event the United States Shipping Board Emergency Fleet Corporation is not liable, because the bills of lading were not signed by the Fleet Corporation, but by Williams, Dimond & Co., agents, which firm the respondent says was a subagent of the Emergency Fleet Corporation, which merely acted as agent for the United States; (c) because the libelants are not proceeding under the Act of March 9, 1920 (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼l), which furnishes the exclusive remedy in admiralty for causes of action arising out of the operation of government vessels.

The respondent bases its contention that the West Aleta did not deviate upon the provision in the bill of lading. It says that the voyage was not a voyage to Rotterdam, but a voyage to Hamburg, with broad permission under the terms of the bill of lading "to touch at any port or ports in any rotation or order in or out of the customary route and to call at any port or ports more than once unto the port of Rotterdam. * * *"

[1] After giving this matter the fullest consideration, I am convinced that under both British and American authorities there was a deviation. I think the permission in the bill of lading related to ports in the course of the voyage. That voyage, what-

ever the master, under instructions from his principals, had determined upon before breaking ground, was the voyage contracted for in the bill of lading. Any other construction would render cargoes subject to all kinds of hazards, which the shippers could not foresee and could not be expected to insure against. The record here shows that the insurance of the cargo for a voyage to Hamburg would have been considerably greater than simply to Rotterdam. The permission "to touch at any port or ports in any rotation or order in or out of the customary route" related to stopping in ports on the way to Rotterdam, either in or out of the geographical order.

My decision in The Emelia S. de Perez, 287 F. 361, invoked a clause where the ship was permitted to proceed "to the port stated in this bill of lading via any port or place en route or beyond, in any order, whether in or out of the customary or advertised route." In this case there was no clause allowing the ship to proceed beyond.

[2] The respondent has also relied upon custom, but as the Court of Appeals of the District of Columbia said in the case of United States Shipping Board Emergency Fleet Corporation v. Levensaler, 53 App. D. C. 322, 290 F. 297:

"Before a custom or usage can acquire the force of law, it must appear that it is general and uniform in the business to be affected by it, and that it has been peaceably acquiesced in without dispute for a long period of time."

[3] I cannot say that the business usage, whereby no more than 18 ships at most of the respondent had usually proceeded from the Pacific Coast to Hamburg before discharging at Rotterdam, and had only done this for a period of about a year, can be regarded as a general and uniform custom having the force of a law, of which shippers should take notice. The English cases demonstrate that there was a deviation. Leduc v. Ward, 2 Q. B. Div. 475; Glynn v. Maegetson, [1893] App. Cas. 351; James Morrison & Co., Limited, v. Shaw, Savill & Albion Co., Limited, [1916] 2 K. B. 783. In the last case the English Court of Appeal went so far as to hold that Havre was not an intermediate port on a voyage from New Zealand to London.

In the case of So. Atlantic S. S. Line v. London-Savannah Naval Stores Co., 255 F. 306, 166 C. C. A. 476, the Circuit Court of Appeals of the Fifth Circuit held that under a clause like the present it would not be a deviation for vessels bound for Bristol,

England, to stop at continental ports. That was not a case under a bill of lading, but involved a general contract between the parties for freight room. There the manager of the concern which contracted for the freight room admitted that if the vessel there tendered had "received the rosin and turpentine as provided in the contracts, and had issued its bills of lading therefor as contemplated by the contracts, it would not have been inconsistent with the contracts, or with the understanding of the parties when the contracts were made, for the ship carrying the goods to carry other goods destined to a continental port or ports and to stop at such port or ports before going to Bristol."

I think the justification for that decision was that the circumstances showed that "continental ports" were intended by the parties to be within the "liberties" granted to the steamship line within the fair meaning of the contract provisions. It is to be noticed that each contract for freight space provided that "it is subject to all the clauses and conditions in the ocean bill of lading used by the vessel, which bill of lading is made part of this contract and a copy of the same shall be furnished upon application."

Now the ocean bill of lading referred to, not only contained the clause, "With liberty to call at any port or ports in or out of the customary route, in any order whatsoever, to receive or discharge coals, cargo, passengers, or for any other purpose, * * *" but also contained on the back the clause, "Also that all goods destined for all points beyond Rotterdam or Antwerp are subject to all conditions, stipulations, and exceptions embraced in the customary form of bill of lading in use at the time of shipment by the carrier or carriers completing the transit."

There was testimony given, not only that "it had been the almost unvarying practice of vessels, carrying naval stores from Atlantic or Gulf ports to Bristol, to carry also other goods consigned to a port or ports in Great Britain or on the continent of Europe, [and] to stop at such other port or ports before going to Bristol," but likewise that the freighter "had previously made shipments under similar contracts with respondent on vessels which were to and did stop at a continental port. The last shipment from Pensacola to Bristol made * * * over the respondent's line went by Rotterdam to Bristol under the same kind of contract."

There can be no doubt, in view of the incorporation by reference of an ocean bill of lading mentioning in terms Antwerp and Rotterdam, and the custom as well as the previous arrangements between the parties, and the admissions at the trial of the manager of the freighter that, if the vessel had received the cargo under the proposed ocean bill of lading, it would not have been a deviation for a vessel bound for Bristol to proceed first to continental ports, even though such ports were as far out of the course as Antwerp and Rotterdam. Certainly the decision must rest upon proof of the practical construction of the contract by the parties or of a general business custom; otherwise, it would be contrary to the great weight of authority in this country and England.

In The Sidonian (D. C.) 34 F. 805, affirmed (C. C.) 35 F. 534, the clause in the bill of lading issued for transportation of freight from Genoa to New York was "with liberty to call at any port or ports, in any rotation, for any purpose whatever." Judge Benedict held that it was not a deviation for the ship to call at Palermo. This case, while not involving a situation where the vessel passed beyond the terminus of the bill of lading voyage, gave an extremely liberal interpretation of a deviation clause. I find no decision, either in this country or England, which permits such a deviation as occurred here without proof of a general business custom or a deviation clause which in terms allows the carrier to proceed to the port stated in the bill of lading "or beyond."

[4] I think there can be no doubt that the Emergency Fleet Corporation is liable. The bills of lading, while signed by an agent, purported to be on behalf of the Emergency Fleet Corporation, for at the end of each one are the words: "Shippers are requested to carefully read this bill of lading which constitutes the contract between the shipper or agent of the owner of the property carried and the United States Shipping Board Emergency Fleet Corporation."

In Sloan Shipyards v. United States Shipping Board Emergency Fleet Corporation, 258 U. S. 568, 42 S. Ct. 389, 66 L. Ed. 762, one of the causes of action involved was for a breach of a contract made by the Emergency Fleet Corporation, "representing the United States of America, party of the second part," yet it was held to be a contract of the Emergency Fleet Corporation. As the New York Court of

Appeals said in Gordon Malting Co. v. Bartels Brewing Co., 206 N. Y. at page 537, 100 N. E. 459: "Where a party signs a contract in his own name, even though he is acting for another, he is personally bound thereby."

[5] I can find no basis for the contention that the libelants must proceed under the Suits in Admiralty Act of March 9, 1920. That act was primarily designed to furnish a remedy in personam against the United States in the place of one in rem against a government-owned vessel employed in the merchant service. It in no way prevents a suit either in admiralty or at common law against the Emergency Fleet Corporation, which is regarded as a private corporation in respect to such remedies. Sloan Shipyards v. U. S. Shipping Board Emergency Fleet Corporation, supra.

An interlocutory decree is granted to each libelant, with the customary reference.