UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION v. ROSENBERG BROS. & CO. SAME v. CALIFORNIA WINE ASS'N. SAME v. S. L. JONES & CO.

(Circuit Court of Appeals, Ninth Circuit. May 10, 1926. Rehearing Denied June 14, 1926.)

Nos. 4748-4750.

1. Shipping ⬩125—As to shipment from San Francisco to Cardiff, held it was a deviation to first proceed to Hamburg, notwithstanding liberty to call clause.

As to shipment from San Francisco to Cardiff, *held* it was deviation to proceed first to Hamburg, 750 miles beyond, notwithstanding liberty clause in bill of lading to touch at any ports in any rotation or order in or out of the customary route; this not being within the scope of the voyage.

2. Customs and usages ⬩19(3).

Evidence *held* insufficient to establish custom, which would allow vessel from San Francisco to go to Hamburg before delivering shipment for Cardiff.

3. Shipping ⬩125.

Deviation ends contract between shippers and carrier, making them responsible for loss of goods.

4. Shipping ⬩138—Harter Act (Comp. St. §§ 8029–8035) affords no protection to carrier for consequences of deviation ending contract.

Contract between shippers and carrier being displaced by deviation, the Harter Act (Comp. St. §§ 8029–8035), in view of last part of section 3, affords no protection to carrier for consequences of deviation.

5. Shipping ⬩131.

Damages for loss of goods shipped is their market value at port of destination.

6. Shipping ⬩131.

Right of recovery of damages for loss of goods shipped is unaffected by shipper being insured and paid by insurer; insurer thereupon being subrogated to shipper's rights.

7. United States ⬩52½, New, vol. 19A Key-No. Series.

Fleet Corporation may not, on the ground of its agency for the United States, be relieved of liability to shipper for loss of goods through deviation of vessel.

8. Admiralty ⬩26—Suit against Fleet Corporation is not barred by Suits in Admiralty Act (Comp. St. Ann. Supp. 1923, § 1251¼ et seq.) as furnishing exclusive remedy, where vessel was lost in foreign country.

The vessel having been lost in foreign country, Suits in Admiralty Act (Comp. St. Ann. Supp. 1923, § 1251¼ et seq.) does not provide an exclusive remedy, preventing suit against Fleet Corporation for loss of goods shipped.

9. Admiralty ⬩61.

Laches, if relied on as a defense to action for loss of goods shipped, should be pleaded.

12 F.(2d)—46

10. Admiralty ⬩34.

Admiralty will by analogy follow state statute of limitations.

Appeals from the District Court of the United States for the Southern Division of the Northern District of California; Frank H. Kerrigan, Judge.

Suits by Rosenberg Bros. & Co., by the California Wine Association, and by S. L. Jones & Co., against the United States Shipping Board Emergency Fleet Corporation. From decrees for libelants (7 F.[2d] 893), respondent appeals. Affirmed.

See, also, 295 F. 372.

Ira S. Lillick and Chalmers G. Graham, both of San Francisco, Cal. (A. M. Boal, F. R. Conway, O. P. M. Brown, and H. F. Birnbaum, all of Washington, D. C., of counsel), for appellant.

J. M. Mannon, Jr., Farnham P. Griffiths, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for appellees.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

HUNT, Circuit Judge. These are appeals in admiralty from decrees against the Shipping Board Emergency Fleet Corporation in three cases, consolidated, instituted by the shippers and owners of cargoes lost on the steamship West Aleta of the European Pacific line, operated by the respondents under contract by Williams, Dimond & Co., from ports on the Pacific Coast to ports in the United Kingdom and the continent of Europe. The suits were carried on as between the cargo insurers, who paid the losses in full, and the operators of the ship, who were fully covered by insurance against any damages that might have to be paid for deviation.

Libelants claimed for failure to deliver, caused by deviation from the voyage. Respondents answered that the loss was occasioned by stranding, error in navigation, peril of the sea, and that, under the terms of the contract of carriage and the Harter Act (27 St. 445; Comp. St. §§ 8029–8035), they were not liable.

The goods were shipped in 1920 at San Francisco under separate bills of lading, some naming Cardiff, Wales, some naming Rotterdam, Holland, as the ports of destination. Taking the bill of lading in one of the cases as an exemplar, it sets forth receipt of the merchandise to be transported by the West Aleta to be carried on said vessel operated by or on account of the United States Shipping Board Emergency Fleet Corpora-

tion or the United States Shipping Board, "with leave * * * to touch at any port or ports in any rotation or order in or out of the customary route, and to call at any port or ports more than once, unto the port of Cardiff, and there deliver in like apparent good order and condition at the vessel's tackles under order," etc. On the face of the bill of lading there was the following clause: "The vessel shall have liberty to deviate for the purpose of making trial trips and shall pay any reasonable increased cost of cargo insurance, if any, incurred in consequence thereof." After a description of the goods there is the following clause: "It is mutually agreed that the ship shall have liberty * * * to deviate for the purpose of saving life or property." And in the conditions included on the reverse side of the bill of lading this clause: "Also, that if on account of weather, * * * war, or other disturbances * * * or any causes beyond the control of the carrier, it should be considered impracticable or unsafe in the opinion of the master to land the goods at the port to which they are destined, the master is to have the option of landing the goods at any other port which he may consider safe, or retain same on board until the vessel's return trip. * * *"

The ship left San Francisco in January, 1920, and on February 10th sighted Bishop Rocks, a part of the Scilly Islands which mark the entrance to Bristol Channel. She did not proceed directly to Cardiff, but, passing the entrance to the port, proceeded easterly through the Straits of Dover, and on February 11th was abreast of the Hook of Holland at the entrance to the port of Rotterdam. The ship did not go to Rotterdam, but took a course for Hamburg, Germany. The master, apprehensive because of mines planted in the North Sea during the World War, changed his course on February 11th, and on the 12th, believing he was safely out of the mine fields, headed east for what he took to be Nordeney light ship. Immediately after the last change of course the ship struck a sand ridge which extended from the westerly end of Terschelling Island, and soon broke in two.

For more than a month prior to the sailing of the ship the European Pacific line advertised the West Aleta for "Hamburg, Rotterdam, and Cardiff" in the Guide, a shipping paper of San Francisco. One insurance policy was issued to the California Wine Association, covering wine to Cardiff and wine and liquor to Rotterdam on the West Aleta, " * * * via Panama Canal to Rotterdam and Cardiff." The policy had a clause, "held

covered at a premium to be arranged in case of deviation or change of voyage, or of any omission or error in the description of the interest, vessel, or voyage."

[1] Using the Cardiff receipt and bill of lading as comprehending the several cases, we have an original contract on a voyage from San Francisco, port of shipment, to Cardiff, port of destination, with leave to the ship to touch at any ports in any rotation or order, in or out of the customary route, and to call at any port or ports more than once.

An interpretation of the contract solely by legal import and construction of the words used, is that the voyage was to Cardiff, with the privilege of going to other ports in or out of order between the termini, in prosecuting the real objects of the adventure intended by the parties. We cannot regard the language of the liberty to call clause, permitting the ship to call at any ports in any order in or out of the customary route, as extensive enough to embrace in the voyage to Cardiff permission to go 750 miles beyond Cardiff and to call at Hamburg and then return to Cardiff. Gawdner v. Senhouse, 128 En. R. 7. Established rules of construction of policies are that the right of liberty to call is to be availed of as subordinate to the principle that the port or ports which the assured may visit shall be only those which are properly in the course of the voyage described, and in pursuance of the general purposes of the adventure embraced within the termini named in the policies. Glynn v. Margetson, 1 Q. B. 337; Id., [1893] L. R. 351. The Supreme Court of Massachusetts in Seccomb et al. v. Provincial Insurance Co., 10 Allen (92 Mass.) 305, said: "The only safe rule of construction is that which confines the meaning of a clause in a voyage policy giving liberty to touch at different ports to a permission to visit those only which are within the scope of the voyage insured." The scope of the voyage may include ports not exactly in the ordinary track of the specific voyage, but not those far outside or beyond the ordinary track. The Wells City (D. C.) 57 F. 317, affirmed 61 F. 857, 10 C. C. A. 123. Bringing the principle to the immediate case, the ports to which the West Aleta could go were those which, in a business sense, would be passed in the usual course of the voyage from San Francisco to Cardiff. A few of the many well-considered cases are Leduc v. Ward, 20 Q. B. D. (1888); U. S. Shipping Board v. Bunge & Bern, 41 T. L. R. 73; Davis v. Garrett, 130 E. R. 1456; Ardan S. S. Co. v. Theband (D. C.) 35 F. 620. But nothing in the bill of lading justifies the view that a

voyage to Hamburg was the adventure in contemplation. Smith v. U. S. Shipping Board, etc. (D. C.) 2 F.(2d) 390.

There is strength too, in the reasoning of the court in United States Shipping Board v. Bunge & Bern, supra, that the general liberty to deviate for the purpose of saving life and property gives some indications pointing to the view that the parties meant to give to their language a limited sense. In emergent circumstances, to save life or property, the ship could deviate without any restriction. Having such a clause under examination, the English Court of Appeals, speaking by Lord Bankes in United States Shipping Board v. Bunge & Bern, supra, said: "It appears to me that the clause itself contains indications which, in my opinion, point to the conclusion that the parties intentionally used the language they did in its limited conventional sense. A distinction is drawn between calling at a port for bunkering or supplies and deviating generally; the right to deviate without any restriction is conferred for the purpose of saving life or property. To obtain bunkers or supplies the liberty is confined to the right 'to call at any port or ports in any order.' There seems to me to be reason in this."

[2] But it is said that the usage and practice of the trade gave to the bill of lading of the West Aleta a meaning which allowed her to go to Hamburg, Rotterdam, and Cardiff, for which she was held out as a common carrier, in the order in which traffic and cargo conditions dictated. Doubtless underwriters are presumed to have knowledge of what is usually done by a ship in such a voyage, and the description of the voyage in the policy refers, of course, to the usual manner of making it. But the oral testimony in support of the contention that the usual and customary manner of performing a voyage from San Francisco to Cardiff was by going first to Hamburg and then to Rotterdam and then back to Cardiff lacks precision and is not convincing. Out of twelve vessels in the European Pacific service, only two called at Hamburg; none went to Rotterdam. There was testimony that the ships of the European Pacific line recognized a "range of ports" which included Bordeaux on the south, and Hamburg on the north, and would include the east coast of Ireland, and that the practical understanding of the liberty clause of the West Aleta was to go to any port in any order within the range. Whether oral testimony of the practical understanding was admissible may well be doubted. (Ætna Ins. Co. v. Sacramento Stockton S. S. Co. [C. C. A.] 273

F. 55; The Delaware, 81 U. S. [14 Wall.] 579, 20 L. Ed. 779; Arnold on Marine Ins. § 56). But, passing that point and treating such evidence as legally received in defining what was the customary route, it fell far short of establishing a usage which would countervail the general maritime practice with reference to which the policy was made, that the ship shall pursue a direct course between her two termini, with permission to call only at any port or ports in or interjacent to the customary route (The Reeside, Fed. Cas. No. 11657).

[3] Our conclusion is that there was a deviation, the effect of which was to end the contract between the shippers and the carrier, thus making the carrier responsible for the loss of the merchandise. Pacific Coast v. Yukon Ind. Trans. Co., 155 F. 29, 83 C. C. A. 625; The Sarnia (D. C.) 278 F. 459.

[4] Inasmuch as the deviation displaced the contract, the provisions of the Harter Act of 1893 afford no protection from the consequences of the wrongful act. As giving some support to that opinion, reference may be had to the concluding part of section 3 of that act, where the words limit the liability in cases of loss arising from saving or attempting to save life or property at sea "or from deviation in rendering such services." It is reasonable to say that, where there has been a deviation for a purpose other than to save life or property, there is liability.

[5, 6] The damages were measurable by the market value of the goods at the destination to which the ship undertook to carry them. St. Johns N. F. Ship Corp. v. Companhia, 263 U. S. 119, 44 S. Ct. 30, 68 L. Ed. 201; U. S. S. Co. v. Haskins, 181 F. 962, 104 C. C. A. 426. No avoidance of the consequence of the act of deviation can be predicated upon the ground that the damages must be limited to such additional insurance premium as the shippers had to pay on account of the deviation. Respondent was insured against liability for deviation, and the defense in this suit on behalf of respondent is by the insurer, successor to American Steamship Owners' Mutual Protection & Indemnity Association. It is a fact that insurance was paid in full to libelants, but it is generally held that, upon payment of the loss, the insurer was subrogated to the rights of the insured. That doctrine was sustained by this court in Pacific Coast Steamship Co. v. Bancroft Whitney Co., 94 F. 180, 36 C. C. A. 135, and Steamship Wellesley v. Hooper & Co., 185 F. 733, 108 C. C. A. 71; The Citta Di Messina (D. C.) 169 F. 472.

[7] It is suggested by the appellant that the Fleet Corporation is not liable because it was

only the agent for the carrier, the United States. In Sloan Shipyard Corporation v. U. S. Shipping Board, 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762, it was held that the Fleet Corporation is answerable for its acts, and may not be relieved upon the ground of agency. Justice Holmes there stated the general rule that a person within the jurisdiction always is amenable to the law, and continued: "Supposing the powers of the Fleet Corporation to have been given to a single man, we doubt if any one would contend that the acts of Congress and the delegations of authority from the President left him any less liable than other grantees of the power of eminent domain to be called upon to defend himself in court. An instrumentality of government he might be and for the greatest ends, but the agent, because he is agent, does not cease to be answerable for his acts." The present suit is not one against the United States, but against the Fleet Corporation, and, if the act of the Fleet Corporation was unlawful even though a suit might have been brought against the United States, nevertheless those injured are not barred of a remedy against the agent that did the wrongful act. In re Eastern Shore Shipbuilding Corporation, U. S. Shipping Board, etc., v. Wood (D. C.) 274 F. 893; Providence Engineering Corp. v. Downey Shipbuilding Corp. (C. C. A.) 294 F. 641; certiorari denied 264 U. S. 586, 44 S. Ct. 334, 68 L. Ed. 862; The Panola (C. C. A.) 9 F.(2d) 733, 1925 A. M. C. 1173; United States Shipbuilding Corp., etc., v. Banque Russo Asiatique (C. C. A.) 286 F. 918; Smith v. U. S. Shipping Board, etc. (D. C.) 2 F. (2d) 390.

[8] We must also decide against the contention that, if the Fleet Corporation is liable there was an exclusive remedy under the Suits in Admiralty Act March 9, 1920 (41 St. 525; Comp. St. Ann. Supp. 1923, § 1251¼ et seq.). In Blamberg Bros. v. United States, 260 U. S. 452, 43 S. Ct. 179, 67 L. Ed. 346, it was held that under the Suits in Admiralty Act, which provides that, in view of the provisions for libel in personam, no vessel owned by the United States shall be subject to seizure by judicial process in the United States, and that, in a case where, if such vessel were privately owned, a proceeding in admiralty could be maintained, a libel in personam may be brought against the United States, no libel can be maintained against the United States while the "vessel is not in a port of the United States or of one of her possessions." Shewan & Sons v. United States, 266 U. S. 108, 45 S. Ct. 45, 69 L. Ed. 192. The purpose of the suits in Admiralty Act as construed in the decisions referred to, is to substitute an action in personam for one in rem. In our case the ship, having been wrecked off the coast of a foreign country, and not having been in any port of the United States at the time the libelants brought these suits, and not having been at that time a merchant vessel, suits in rem could not have been brought under the Suits in Admiralty Act. The Cape Fear (D. C.) 8 F.(2d) 80; Atlantic Fruit Co. v. United States (D. C.) 8 F.(2d) 81; Markle v. United States (D. C.) 8 F.(2d) 87; Mack Engineering Co. v. United States (D. C.) 291 F. 713.

[9, 10] Appellants ask this court to apply the rule of laches. If respondents relied upon that defense, they should have pleaded accordingly. Green Star S. S. Co. v. Nan Yang Bros. Tobacco Co. (C. C. A.) 3 F.(2d) 369. However, it has been held in this circuit that a court of admiralty will, by analogy, follow the state statute of limitations. Pacific Coast S. S. Co. v. Bancroft Whitney, supra; Cresci v. Standard Fisheries (D. C.) 7 F.(2d) 378; Benedict on Admiralty, § 554. Engel v. Davenport, 46 S. Ct. 410, 70 L. Ed. ——, decided April 12, 1926, is not in conflict with our view.

The decrees are affirmed.