## THE FREDERICK LUCKENBACH.

(District Court, S. D. New York. September 13, 1926. On Reargument, October 1, 1926.)

1. **Evidence** ⬤⟹148.

Inaccurate testimony of employee of steamship company as to telephone conversations, four years previously, *held* purely speculative and without testimonial value.

2. **Shipping** ⬤⟹209(3).

If steamship company, before issuing bills of lading, established route via certain ports as regular and customary course, it would have been competent to show shipper's knowledge thereof, as negativing claim of deviation on issue of limitation of liability.

3. **Shipping** ⬤⟹209(3).

In proceeding for limitation of liability, proof that steamship on one prior voyage had called at certain ports *held* insufficient to establish customary route at variance from that implied in bills of lading.

4. **Shipping** ⬤⟹125.

Literal reading of liberty of call clauses in bills of lading cannot be permitted to authorize serious deviation from route, when such would defeat substantial purpose of contract.

5. **Shipping** ⬤⟹125.

In absence of express provisions in bill of lading authorizing departure from usual route, liberty of call clause will be construed as only permitting calls at ports properly in course of voyage.

6. **Shipping** ⬤⟹207.

Under bills of lading not authorizing departure from usual course, ship and owner *held* liable without limitation for loss and damage to cargo resulting from ship's deviation from usual course.

7. **Shipping** ⬤⟹125.

Under bill of lading authorizing deviation from regular or scheduled or advertised ports of call, liability of ship for damage to cargo will not attach because of deviation to port off usual route for purpose of discharging cargo.

**8. Shipping ⚖️⟹120.**

Ship and owner are not liable for damage to cargo resulting from peril of the sea.

**On Reargument.**

**9. Shipping ⚖️⟹125.**

Liberty of call clause in bill of lading must be construed in business sense, with purpose of contract always in mind.

**10. Shipping ⚖️⟹125.**

Under bill of lading authorizing deviation from regular ports of call or in contrary directions as carrier may determine, ship *held* authorized to proceed in opposite direction to secure cargo before proceeding toward port of discharge.

In Admiralty. Petition by the Luckenbach Steamship Company, Inc., as owner of the Steamship Frederick Luckenbach, for limitation of liability. Decree in accordance with opinion.

Carter & Phillips, of New York City (Peter Carter and Robert Phillips, both of New York City, of counsel), for petitioner.

Bigham, Englar & Jones, of New York City (Henry N. Longley and James N. Senecal, both of New York City, of counsel), for claimants.

THACHER, District Judge. Denying petitioner's right to limit liability, owners of cargo shipped from Pacific Coast ports to New Orleans and Mobile per steamship Frederick Luckenbach have filed claims for cargo damage, claiming deviation because, instead of sailing directly from Colon through the Yucatan Channel to Mobile or New Orleans, the vessel sailed through the Windward Passage to Neuvitas, Cuba, pursuant to orders of the petitioner. On the voyage from Neuvitas to New Orleans the ship encountered a hurricane and put into Tampa Bay in distress; the vessel and cargo being seriously damaged. The distance from Colon to the South Pass Lightship at the mouth of the Mississippi is 1,300 miles, while the distance from Colon to Neuvitas via the Windward Passage is 900 miles, and it is 810 miles from Neuvitas to South Pass Lightship.

The cargo in question was shipped under various bills of lading, each of which names either New Orleans or Mobile as the port of destination, and all but one of which contains the following clause:

"(18) Shall have liberty to sail without pilots, to deviate for the purpose of saving life or property, to tow and assist vessels in any situation, to go to or stop at any ports en route or beyond, in any order, and to deviate with like privilege to stop."

One bill of lading, covering 1,100 cans of canned salmon, shipped by Everding & Farrell to New Orleans, final destination, Vicksburg, Miss., contains the following clause, which is not contained in the other bills of lading:

"(19) The carrier shall have liberty * * * to proceed by any route, although it be other than the advertised, scheduled, or intended route, at any stage of the voyage, and to proceed toward, or to, and enter and stay at, or return to, any ports or places whatsoever, although not regular or scheduled or advertised ports of call, or in a contrary direction to or outside the usual or scheduled route, or beyond said port of destination, once or oftener, in any order, backwards or forwards, for the purpose of bunkering, or of securing, loading and/or discharging cargo, or for any other purpose that may seem advisable to the carrier or master. The vessel shall also have liberty to sail with or without pilots, to tow and assist vessels in all places and situations, and to take any measures deemed advisable for the purpose of saving life or property. All of the matters and operations mentioned in this paragraph are agreed to be within the intended voyage, and not a deviation."

The ship was advertised as engaged in an express freight service to Mobile and New Orleans. In some of the advertisements the service to these ports was described:

"Mobile and New Orleans.

"Through Bills of Lading Issued.

"With Direct Service."

In connection with this voyage no mention was made of any Gulf or Cuban ports, other than Mobile and New Orleans.

[1] Attempt was made to show that some of the claimants had knowledge that the ship would touch at Cuban ports. An employee in the petitioner's San Francisco office, in charge of its east-bound freight department, testified generally that it was his custom to solicit freight for Cuban ports, and to advise shippers with whom he came in contact that the petitioner's vessels would call at such ports. He said this was done in connection with the voyage in question, and testified that he so advised the representatives of six firms who shipped cargo on the Frederick Luckenbach. It appears that only two of the firms he named had any cargo on this ship. His principal business was to confirm bookings previously made by other persons employed in his de-

partment. This was usually done by telephone, and his recollection, after more than four years, of the persons with whom he talked and of what he said, was vague and uncertain. In four out of six instances he was certainly in error, and his testimony in regard to the other two was contradicted by the persons with whom he claims to have talked. Belief cannot take the place of recollection. The petitioner's witness reasoned himself into a belief that the conversations he narrated had occurred, but I am satisfied that he had no actual recollection of them. His testimony was purely speculative and without testimonial value.

[2, 3] If before issuing bills of lading the petitioner had publicly established a route to Mobile and New Orleans via Cuban ports as the regular and customary course of its vessels engaged in this trade, and had advertised the establishment of this route to the world, it would have been competent to show a shipper's knowledge of the established, usual, and customary route. W. R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha (The Tokuyo Maru) 12 F.(2d) 519, 1926 A. M. C. 862 (C. C. A.). But the proofs do not disclose any established usage or custom of which shippers would be required to take notice. There was only one prior voyage to Gulf ports. In that instance the vessel was advertised to go only to New Orleans and Mobile, and, although she did in fact call at Neuvitas, it was not generally understood in the trade that she would do so, nor was it generally known, when the shipments here in question were made, that she had done so. Such proof was insufficient to establish a customary route in variance with the implication to be drawn from the bills of lading. Smith v. U. S. S. B. E. F. Corp'n (D. C.) 2 F.(2d) 390. The advertising of the voyage in question and the bills of lading issued to the claimants all indicate a direct voyage to New Orleans and Mobile. Accordingly I find that the petitioners have not established by practice or publication the route via the Windward Passage as the course to be followed by its vessels engaged in the Gulf trade, and that none of the claimants had knowledge that the vessel would thus proceed or would call at any Cuban port.

[4] The case therefore turns upon the construction to be given to the liberty of call clauses in the bills of lading, and the application of these clauses to the course taken by the vessel in proceeding to Neuvitas for the purpose of discharging cargo. Such clauses have often been construed, and it is well settled that they cannot be permitted to operate to the extent of their literal scope, when this would defeat the substantial purpose of the contract. The Wells City, 61 F. 857, 10 C. C. A. 123; Ardan S. S. Co., Ltd., v. Thebaud (D. C.) 35 F. 620; United States Shipping Board Emergency Fleet Corp. v. Rosenberg Bros. & Co. (The West Aleta) (C. C. A.) 12 F.(2d) 721, 1926 A. M. C. 855; Gairdner v. Senhouse, 3 Taunt. 16, 22; Leduc v. Ward, 20 Q. B. Div. 475, 479.

The rule is one of interpretation, by which the meaning of words having a general significance is confined within the particular purpose of the agreement. But in ascertaining the true sense in which general words are used, the words themselves cannot be deprived of all meaning, for this would not be to interpret the agreement but to erase a part of it. Thus instances may be found where, because of the particularity with which the parties have provided that the ship may depart from the established and customary route, such departures, not foreign to the general purposes of the voyage, have been permitted. Dietrich v. U. S. Shipping Board Emergency Fleet Corp'n (C. C. A.) 9 F.(2d) 733; The Blandon (D. C.) 287 F. 722; The Emelia S. De Perez (D. C.) 287 F. 361.

[5] In each of these cases there was an express provision, which not only authorized the ship to call at ports en route, but to depart from the usual route and to call at ports outside the ordinary course of the voyage, and it may be safely said that liberty of call clauses, in the absence of such express provisions, will always be construed as only permitting calls at ports or places which are properly in the course of the voyage described. The West Aleta, supra; Leduc v. Ward, supra.

The course which the Frederick Luckenbach took from Colon through the Windward Passage to Neuvitas, and thence across the Gulf to Mobile and New Orleans, was outside and beyond the ordinary track of vessels sailing through the Canal to the latter ports. In no business sense can it be said that Neuvitas, on the north coast of Cuba, would be passed in the usual course of a voyage from the Pacific Coast to Mobile and New Orleans. The ship not only went out of her way, but in so doing took a course which involved well-known difficulties and dangers of navigation, all of which would have been avoided by taking the direct and usual course from the Canal to the mouth of the Mississippi.

[6-8] With the single exception of one of the bills of lading issued to Everding & Farrell, none of the bills of lading contained any provision authorizing a departure from the usual course, and I am therefore constrained to hold the ship and her owner, privity being shown, liable for all loss and damage to all of the cargo on board, excepting that covered by the bill of lading issued to Everding & Farrell, identified in the stipulation by the number "50." The terms of this bill of lading expressly authorized the ship, not only to make calls en route, but outside of the usual scheduled route, and for the purpose of securing, loading, and/or discharging cargo. Under the broad provisions, the call at Neuvitas for the purpose of discharging cargo seems to be clearly authorized under the decision of the Circuit Court of Appeals of this circuit in Dietrich v. U. S. Shipping Board Emergency Fleet Corporation, supra.

But two questions remain affecting the rights of the parties with respect to this shipment. Upon the trial it was claimed for the first time that an unauthorized deviation occurred from Seattle to Tacoma. In the claimants' brief, liability on this ground is claimed only in behalf of cargo laden at Seattle. The shipment made by Everding & Farrell was laden in No. 2 hold at Portland. No damage to this cargo resulted from improper stowage of lard in No. 3 and No. 4 'tween decks, since it is only claimed that cargo in Nos. 3 and 4 holds was damaged in this way. Nor is it contended that any damage in No. 2 hold resulted from any cause other than a peril of the sea, for which the ship and her owner is not liable.

A decree without limitation of liability in favor of each of the claimants may be entered, with the usual provision for reference to determine the amount of their loss. In the case of Everding & Farrell, however, the decree will be limited to cargo covered by bill of lading covering the shipment of 1,265 cases of canned salmon, which in the stipulation is identified by number 49.

### On Reargument.

In connection with the Everding & Farrell shipment, attention has been called to an error in the opinion filed September 13, 1926. It appears that liability *was* asserted in behalf of Everding & Farrell on the ground that the vessel illegally and without justification deviated from her proper course between Portland and New Orleans by proceeding to Seattle and Tacoma. It is therefore necessary to consider whether her call at these ports for the purpose of securing and loading cargo was justified under the provisions of clause 19 of the bill of lading covering a shipment of 1,100 cans of canned salmon, which in the stipulation is identified by number 50. This clause is quoted in the opinion filed September 13th.

[9, 10] In behalf of the shipper it is contended that the broad language of this clause gives no liberty of call until after the voyage has commenced, and that, the ship having proceeded from Portland in a direction contrary to her destination, she must be held to have done so in violation of her contract of carriage. Reliance is placed upon the decision in the House of Lords in Glenn v. Margetson & Co., L. R. [1893] A. C. 351. The clause in question in that case did not expressly authorize departure from the course of the voyage, and so it was decided that the parties intended that the ship might touch and stay only at those ports which in a business sense might be regarded as on the way between the port of departure and the port of destination. But here the vessel is authorized "to proceed toward or to, and enter and stay at, or return to, any ports or places whatsoever, although not regular or scheduled or advertised ports of call, or in a contrary direction to or outside the usual or scheduled route * * * for the purpose of bunkering, or of securing, loading, and/or discharging cargo. * * * All of the matters and operations mentioned in this paragraph are agreed to be within the intended voyage, and not a deviation."

Such clauses are to be construed in a business sense, with the purposes of the contract always in mind. The voyage contemplated was from Portland to New Orleans, with such departures from the course as are authorized by the clause in question. The ship sailed from Portland and proceeded to Seattle for the purposes authorized. Whether this departure from the regular course was first contemplated before or after the commencement of the voyage is not important, because the agreement is that if authorized at all such an operation is within the intended voyage. Therefore I do not regard the omission of the words "either before or after proceeding toward the port of discharge," which are found in the clause under consideration in Dietrich v. U. S. Shipping Board E. F. Corp'n (C. C. A.) 9 F.(2d) 733, as of significant importance, and conclude that the ship was authorized by the terms of the bill of lading in question to proceed as she did to Seattle and

Tacoma for the purpose of securing cargo before proceeding toward the port of discharge.

In the course of the reargument the petitioner requested an opportunity to submit additional evidence bearing upon the lard shipments, and this matter is still pending. The result is that with respect to all shipments, excepting the shipments of lard, the decision previously rendered will stand without change, and decrees in favor of all the shippers, except the shipper of lard, may be entered as originally directed, with provision for usual reference.