## THE KERMIT.

**LAMBORN et al. v. AMERICAN SHIP & COMMERCE NAVIGATION CORPORATION et al.**

No. 7582.

Circuit Court of Appeals, Ninth Circuit.
March 25, 1935.

Alfred C. B. McNevin, of New York City, L. K. Vermille and Overton, Lyman & Plumb, all of Los Angeles, Cal., and Farnham P. Griffiths, George E. Dane, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for appellants and cross-appellees.

Ira S. Lillick, of San Francisco, Cal., John C. McHose and Young, Lillick, Olson & Kelly, all of Los Angeles, Cal., and James H. Herbert and Kirlin, Campbell, Hickox, Keating and McGrann, all of New York City, for appellee and cross-appellant.

Before WILBUR and GARRECHT, Circuit Judges, and NORCROSS, District Judge.

GARRECHT, Circuit Judge.

This case is before this court on appeal and cross-appeal from a decree in an action in rem in admiralty.

The original libel by appellants and cross-appellees against the steamship Kermit was an ordinary libel for cargo damage. It alleged that the respondent vessel was a common carrier; that there were shipped on board her at Hamburg, June 15 and 17, 1920, 16,780 cases of refined sugar for carriage to New York; that clean bills of lading were issued therefor; and that the sugar was delivered in New York on July 6, 1920, in a damaged condition. Damages in the sum of $57,150 were claimed. The libel was filed in Los Angeles, Cal., on December 16, 1924, four years and six months after the shipment was made.

An answer was filed admitting the shipment and denying the other material allegations of the libel, and, in addition, set forth various defenses, including, first, that by the terms of the bill of lading the carrier was expressly exempted from liability for damage due to weak or insufficient cases, which admittedly had caused all the asserted damage, and, second, that the cause of action arose more than four years preceding the filing of the libel, and that the libelants were therefore barred under the general maritime law and under the laws of the state of California for laches and delay.

Two amended libels were thereafter filed, the first added an allegation that the Kermit had not been within the jurisdiction of the District Court for the Southern District of California for a total aggregate period of four years since June 15, 1920. A second amendment alleged fraud on the part of the respondent, her agents, etc., in that, notwithstanding the frailty of the cases in which the sugar was packed had been noted by the carrier, the shippers were issued clean bills of lading against a letter of indemnity. These allegations were denied by claimant, appellee, upon the ground that it had "no personal knowledge or information sufficient to enable it to form a belief" with regard thereto, and it further alleged that, if any such arrangements had been made, this was done by the Hamburg-American Line without claimant's knowledge or consent.

In the spring of 1920 there was an acute shortage of sugar in the United States. Dealers, therefore, began to buy and import sugar from countries that were not normally sources of supply for this country. In April, 1920, the libelants, sugar brokers and importers of New York, learned that the Czecho-Slovak Sugar Export Company, Limited, of Prague, had a large quantity of Czecho-Slovakian sugar that it wished to dispose of in the world mart. As a result of negotiations had by libelants through Czecho Slovak & American Corporation, a New York corporation, with offices at Prague, in which corporation libelants owned 50 per cent. of the stock, and of which corporation Arthur H. Lamborn was president, libelants purchased from the Czecho-Slovak Sugar Export Company, Limited, 1,500 tons of tablet sugar in wooden cases of 50 kilos each; the purchase price being a sum in the neighborhood of $583,000. Arrangements for payment were made by Lamborn opening a letter of credit in favor of the sellers for the sum named through the Irving National Bank. The letter specified, among other things, that the bills of lading were to bear the clause:

"Notify Lamborn & Company, New York. Negotiable ship's receipt may be attached to your draft instead of a bill of lading."

In the early part of June, 1920, 16,780 cases of sugar were delivered to the Hamburg-American Line at Hamburg, Germany, for carriage to New York on the steamship Kermit. While the sugar was being loaded, the chief officer of the Kermit called the attention of the master, Capt. Strong, to the fact that "the cases were frail considering the weight that was in the boxes." The master, fearing that there would be a claim on delivery, told Capt. Roede, the loading agent for the Hamburg-American Line, about the condition of the cases, and that afternoon wrote a letter to the Hamburg-American Line calling its attention thereto. Concerning this matter, in the evidence the master testified in response to interrogatories as follows:

"Q. Did you see some of these cases coming on the ship? A. Yes.

"Q. Did you point out the bad condition to him? A. Yes.

"Q. Do you know whether he saw any broken cases? A. He saw the same condition that I did.

"Q. Did you see broken cases? A. The trouble was for men to walk on, they were not quite strong enough.

"Q. Did you see broken cases? A. I can't say. I don't want to commit myself; there must have been something the matter that I called attention to."

The American Ship & Commerce Navigation Corporation, claimant and appellee, was the owner of the Kermit. The Kerr Steamship Company was the agent of the appellee, and the Hamburg-American Line were subagents for the ship and her owner at Hamburg under arrangement with the Kerr Steamship Company.

This shipment of sugar was moved under two bills of lading, the first dated June 15, 1920, was for 6,430 cases, the shipper being Schneider & Co., the second, for 10,350 cases, dated June 17, 1920, the shipper being Cohrs & Amme. The master testified that it was on the afternoon of June 17, 1920, that he first noticed the frail cases before being placed on board the ship, and that on that day he wrote the letter calling the agent's attention to that fact. The testimony discloses that a letter of indemnity was received by the Hamburg-American Line from Cohrs & Amme covering 10,350 cases; that the acceptance of this letter of indemnity and the issuance of the clean bill of lading for the shipment for these 10,350 cases was done without the master's knowledge, and he testified that he had no authority from his owners to accept the letter of indemnity and issue a clean bill of lading.

The Kermit arrived in New York on July 3, 1920, and berthed at Pier 4, Army Base, Brooklyn, where the Mar Mediterraneo was already discharging 30,000 cases of sugar, a balance of the 1,500 tons purchased at the same time from the Czecho-Slovak Sugar Export Company, Limited. Five days later, on July 8th, the documents not having arrived, Lamborn paid $240,000 to the Irving National Bank on account; filed with the collector of customs a letter of authorization from the bank and a bond to produce the bills of lading; and, on July 9th, paid the custom charges of $25,155.36, and obtained release of the cargo from customs. On the same day Lamborn paid the Kerr Steamship Company's bill for freight, amounting to $9,292.84. On the 10th the documents arrived, and the bank billed Lamborn for the amount remaining due on account, which bill was paid the same day, and the Irving National Bank indorsed the bills of lading and delivered them to Lamborn.

There is testimony that cases containing the sugar came out of the ship broken; that others too weak to sustain the pressure of the sling ropes were crushed and the contents strewn about the dock; that work was necessary in repacking and reconditioning the cases; and that certain of the spilled sugar was gathered up into bags and sold as sweepings.

The District Court, while holding the libelant was damaged, dismissed the case for laches. Claimants filed a cross-appeal to that portion of the decision of the court finding that libelants were damaged by claimant, and much of the briefs of counsel are taken up with the discussion of the merits of the cause as to damages.

On this branch of the case it is unnecessary for this court to express an opinion, as our conclusion disposes of the matter upon the question of laches.

On this the pertinent facts are as follows: The Kermit with cargo of sugar arrived at Brooklyn on July 3, 1920. She completed discharge of the cargo about July 9, 1920. On October 27, 1920, a claim was submitted to Kerr Steamship Company, Inc., for shortage in weight on sugars

which arrived on the steamship Mar Mediterraneo and the steamship Kermit. On January 22, 1920, previous claims for loss or damage in relation to the sugar cargo shipped on the steamship Kermit were withdrawn and a new claim for $846.11 was submitted. This claim was rejected on April 14, 1921. Libelants, as they claim, after being informed that a guaranty had been issued by the shipper against loss due to unsound packages, about June 3, 1921, submitted a new claim for loss of sugar on the steamship Kermit amounting to $846.11, and for expenses amounting to $6,555.86 for recoopering damaged cases, for wharfage, and other expenses on cases of sugar which were shipped on the Mar Mediterraneo and the Kermit. These claims were rejected by the Kerr Steamship Company, Inc., on June 6, 1921. This libel against the ship was not filed until December 16, 1924, and was for a claim for damages in the sum of $57,150.

During the interval from the time this sugar cargo was discharged until the libel was filed the Kermit had touched at American ports on forty-one different occasions for a total stay of 189 days. The Kermit was in the port of New York on five different occasions for a total stay of 74 days. The libelants' office is in New York City, not very far distant from the office of the claimant. On October 28, 1925, claimant filed exceptions to the libel which were decided by the District Court in June, 1927. The claimant filed its answer in August, 1927. No testimony was taken by the libelants until January, 1930, which was 9½ years after the cause of action arose, and more than 5 years after the libel was filed. It was 13 years after the cause of action arose before the case came on for trial. Claimant's testimony shows that as early as 1925 it instituted a search for various logbooks and other of the ship's documents without success. The testimony also shows that a demand was made on libelants for the correspondence relating to the purchase of the sugar which was not produced.

To indicate the effect of the delay on the testimony of the witnesses and their recollection of the event, we quote from the testimony of Joseph McGlynn, a witness for libelants:

"Q. Did you or the men under you put new cases about any of the cases that came out of the Kermit? A. No, not new cases.

"Q. You did not put any new cases on them? A. No.

"Q. How long were you engaged in the handling any of the sugar cargo that came out of the Kermit? A. How long?

"Q. How long were you there? A. That I could not say. I cannot say that now.

"Q. Approximately? A. I could not say; so long has gone by. It might be a day or it might be five days."

At another place this witness, who had charge of the repair work, if any, also testified:

"Q. Have you any distinct recollection of the part of the Kermit in which the sugar cargo was stored? A. No, sir, I have not.

"Q. Do you know in how many hatches or holds it was stored? A. No, I do not.

"Q. Do you recall whether or not it was under other cargo in the Kermit? A. That I could not say.

"Q. Have you a recollection of looking at the sugar cargo in the Kermit? A. Yes.

"Q. Will you describe the sugar cargo when you first saw it? A. It looked very good."

The testimony of this witness was concluded as follows:

"Q. In your opinion would there be less damage done to the sugar in the draft if a spreader were used? A. If a spreader was used they tried to protect it that way. That is the reason they used a spreader.

"Q. Would there be more damage done if no spreader or platform was used? A. Of course there would.

"Q. Your best recollection is, however, is it, that there was no platform used? A. I did not say that.

"Q. What is your testimony? A. I said I could not say. There may have been a platform.

"Q. Are you positive that there was damage to the sugar when it was coming off in the slings? A. Am I positive? No, I could not exactly be positive. It is 12 years ago this thing happened. I would have to have an awful memory."

Quotations could be multiplied from the testimony of other witnesses to indicate that they had very little recollection relative to events concerning this particular sugar cargo shipped in the steamship Kermit.

The dealings of the libelants in procuring transportation for the sugar and in the correspondence and controversy relative to the claims was with Kerr Steamship Company, who were agents for the

Kermit. This connection was discontinued some time prior to September 16, 1921, for on that date the libelants were advised in a letter as follows: "For your information in the event you contemplate pushing this claim, the steamer 'Kermit' is owned by the American Ship & Commerce Navigation Corporation, and this company has no connection with them in any way, nor is the steamer operated by us any longer." The California Code of Civil Procedure, § 337, provides that an action on a contract obligation or liability founded upon an instrument in writing must be commenced within four years. The District Court, by analogy, adopted the statute in determining that libelants were guilty of laches.

Appellants strenuously contend that federal courts of admiralty will not be governed by state statutes of limitation in the enforcement of maritime liens, and cite the case of Western Fuel Co. v. Garcia, 255 F. 817 (C. C. A. 9), as committing this court as being opposed to the doctrine of analogy. However, this case on appeal to the Supreme Court of the United States was reversed; the court holding that the statute of limitations had been properly invoked. 257 U. S. 233, 42 S. Ct. 89, 66 L. Ed. 210. The doctrine of laches may be invoked independently of any statute of limitations. It is well established that the federal courts of this circuit have repeatedly applied the rule of laches in admiralty cases. Westfall Larson & Co. v. Allman-Hubble Tug Boat Co., 73 F.(2d) 200 (C. C. A. 9); United States Shipping Board E. F. Corp. v. Rosenberg Bros. & Co., 12 F.(2d) 721 (C. C. A. 9); The San Rafael, 141 F. 270 (C. C. A. 9).

"There is no absolute rule as to what constitutes laches or staleness of demand, and no one decision constitutes a precedent in the strict sense for another. Each case is to be determined according to its own particular circumstances. In other words, the question of laches is addressed to the sound discretion of the chancellor, and his decision will not be disturbed on appeal unless it is so clearly wrong as to amount to an abuse of discretion. In determining whether there has been laches, there are various things to be considered, notably the duration of the delay in asserting the claim, and the sufficiency of the excuse offered in extenuation of the delay, whether plain-

tiff acquiesced in the assertion or operation of the corresponding adverse claim, the character of the evidence by which plaintiff's right is sought to be established, whether during the delay the evidence of the matters in dispute has been lost or became obscured or the conditions have so changed as to render the enforcement of the right inequitable, whether third persons have acquired intervening rights. * * *" 21 C. J. § 217, pp. 217–219.

"Several conditions may combine to render a claim or demand stale in equity. If by the laches and delay of the complainant it has become doubtful whether adverse parties can command the evidence necessary to a fair presentation of the case on their part, as, for instance, where parties interested and witnesses have died in the interim, or if it appears that they have been deprived of any advantages they might have had if the claim had been seasonably insisted on, or if they be subjected to any hardship that might have been avoided by reasonably prompt proceedings, a court of equity will not interfere to give relief, but will remain passive; and this although the full time may not have elapsed which would be required to bar a remedy at law. * * *" 10 R. C. L. 400, § 417.

"And 'the mere institution of a suit does not relieve a person from the operation of the rule of laches; if he fails to prosecute his suit diligently, the consequences are the same as though no suit had been begun.' 21 C. J. 125; Johnston v. Standard Mining Co., 148 U. S. 360, 13 S. Ct. 585, 37 L. Ed. 480; Sullivan v. Portland R. Co., 94 U. S. 806, 24 L. Ed. 324; Baber v. Baber, 121 Va. 740, 94 S. E. 209; Drees v. Waldron (C. C. A. 8) 212 F. 93, 128 C. C. A. 609; U. S. v. Fletcher (C. C. A. 8) 242 F. 818, 155 C. C. A. 406; Northrup v. Browne (C. C. A. 8) 204 F. 224, 122 C. C. A. 496; Hendryx v. Perkins (C. C. A. 1) 114 F. 801, 52 C. C. A. 435." Gill v. Colton, 12 F.(2d) 531, 535 (C. C. A. 4).

As the decisions indicate, the question of laches is addressed to the sound discretion of the trial judge, and his decision will not be disturbed on appeal unless it is so clearly wrong as to amount to an abuse of discretion. In this case we cannot say that the lower court abused its discretion.

Affirmed.