# THE HENRY W. CRAMP.

(District Court, E. D. Pennsylvania. July 2, 1925.)

No. 43 of 1917.

1. Shipping ⚖=51 — Deviation from proper course of charter party voyage is breach by carrier.

Deviation from proper course of charter party voyage is breach of contract by vessel, and other party may elect to declare breach and claim damages, or may waive default and insist on performance.

2. Shipping ⚖=104—Carrier vessel under embargo may declare contract off.

A carrier vessel under embargo may declare a contract of carriage off, because of impossibility of performance, when that impossibility appears.

3. Shipping ⚖=115—Carrier may not plead embargo voluntarily assumed as excuse for performance of contract.

A carrier may not plead, in excuse of performance of a contract of carriage, an embargo to which it has been voluntarily subjected.

4. Shipping ⚖=132(3)—Burden of proving that subjection to embargo was not voluntary on carrier.

Where carrier entered a port and became subjected to embargo, burden of proving that entry was not voluntary, but under stress of necessity, held to be on carrier.

5. Shipping ⚖=115—Carrier, prevented from performing contract by vis major, may annul contract by restoration of precontract situation.

An ocean carrier, prevented from performance of contract of carriage by the vis major of an embargo, would have right to annul contract, but only on restoration of shipper to precontract situation by return of freight, etc.

In Admiralty. Libel by Albert T. Rosasco against the American schooner Henry W. Cramp. On hearing on libel, answer, and proofs. Decree for libelant.

Loomis & Ruebush, of New York City, and Biddle, Paul, Dawson & Yocum and Howard H. Yocum, all of Philadelphia, Pa., for libelant.

Howard M. Long, of Philadelphia, Pa., for respondent.

DICKINSON, District Judge. An understanding of the merits of this cause can best be reached by following the situation of the respective parties step by step, as they have made it, with appropriate comments. The vessel made a charter party contract November 20, 1916, before the United States had entered the World War. Following this, after the declaration of war, she received on

board and issued bills of lading for a cargo of lumber to be delivered at Genoa, Italy. These bills of lading were five in number, and bear date May 4, May 10, and three of them May 23, 1917. So far as affects the decision of the cause before us, the usual and ordinary obligation of the carrier vessel was in no wise lessened by any provisions of the charter party contract or the bills of lading. The vessel cleared from the port of Pensacola, and sailed on June 1, 1917, for Genoa, and on June 27th put in at Norfolk, Va. She remained there until some time later, when she sailed or was towed to Philadelphia, reaching there in the latter part of September. She discharged her cargo of lumber on lighters, and notified the holders of the bills of lading that the lumber was at their risk. The owners of the cargo sold it in the latter part of December, 1917, or early in January, 1918.

Recurring again to the making of the charter party, the then intending shippers were urgent in their demand that the schooner proceed to Pensacola to be loaded. The charter party was silent on the subject of insurance of the vessel. The agent of the owners, asserting the vessel to be free of all legal obligation to proceed on the voyage, but without assigning any reason for the statement, and professing to feel that there was, however, a moral obligation to comply with the charter party contract, refused to let the vessel go on her voyage unless she was insured, and further unless the charterers procured and paid for $50,000 of insurance upon her. The libelants replied to this demand that they were advised that insurance to $50,000 could be procured for $7,500 and agreed to increase by that sum what the schooner was to receive for the carriage. This offer the vessel accepted, and at once proceeded to Pensacola to take on board her cargo. She then received prepayment of the freight and the additional $7,500 agreed to be contributed toward the insurance premium. The cargo was then put on board, and the bills of lading issued as before stated. No insurance was at this time procured, and there is no clear evidence that any was at that time procurable.

The question of fact has been raised whether there was any bona fide intention on the part of the vessel to go to Genoa. Upon this point there is no need of a finding, for reasons which will later appear. The schooner, however, cleared for Genoa, as already stated. It is asserted and denied that she became unseaworthy after leaving the port of Pensacola, and put into Norfolk under the stress of necessity. Here, again, there is no need of a finding.

[1] Let us interrupt the recital of events by taking a survey of the situation of the parties at this time, in order to get an appraisal of their respective rights. Assuming the going into the harbor of Norfolk was a deviation from the proper course of the charter party voyage, this was a breach of the contract by the vessel, and gave to the other party the clear right to declare the breach and claim damages for the broken contract. The libelants had the further and equally clear right, however, to waive the default, refuse to accept a breach, and to insist upon performance of the contract. They elected to pursue this latter course. It becomes, then, of no importance to inquire whether there was a deviation or not. It may be they were impelled to this course by contracts into which they had themselves entered, but we are concerned, not with their motives, but with their acts. The same observation applies, for a like reason, to the movement of the vessel to Philadelphia, as the libelants, after this second breach, again elected to keep the contract in force. There was not merely this election on the part of the libelants, but an acquiescence in it on the part of the vessel, for from the time of her arrival at Norfolk to at least the time of the discharge of the cargo she kept up, either bona fide, or at least the pretense and proffer of a continuance of the interrupted voyage as soon as it could be resumed. The failure to sail is due to the laying of an embargo upon all vessels and a refusal of a permit to leave the harbor. This embargo went into effect in 1917, and was in force from the time the vessel reached Norfolk.

This brings us again to the time and act of the discharge of the cargo, an act which the cargo owners accepted as a breach, and thereupon filed, on January 21, 1918, their libel. There were several acts of the vessel which might have been declared (whether successfully or not does not now concern us) breaches of her contract to carry. One was the first deviation from the voyage to which we have referred, and the taking of the vessel to Norfolk; another was the second deviation, by taking the vessel to Philadelphia; and the third was the definite abandonment of the voyage at a date which we will fix as of January 10, 1918. The libelant (as was his right) refused to accept of the earlier acts as breaches. The last could not be refused.

The broad question then becomes this: A contract of carriage; the contract rendered

impossible of performance by the restraint of princes in the form of an embargo. Is the carrier under a legal obligation to indefinitely continue a readiness to carry, or may the contract be declared off because impossible of performance after this impossibility appears? A subordinate question may likewise arise of whether a vessel, not subject to an embargo which voluntarily subjects itself to restraint, is permitted to make the embargo an excuse for nonperformance of a contract of carriage into which it has entered? In the latter case, the question may become whether the subjection to the embargo was voluntary or forced by conditions which the carrier could not control.

[2, 3] Respecting the first broad question, our findings are: (1) That a carrier vessel under embargo may declare a contract of carriage off because of impossibility of performance when that impossibility appears; and (2) that the fact situation of the embargo and the unsuccessful efforts of both carrier and shipper to have it lifted warranted the inference that the contract was impossible of performance.

Respecting the second question, our finding is that a carrier may not plead in excuse of performance of a contract of carriage an embargo to which the carrier has been voluntarily subjected.

[4] Respecting the third question, our finding is that subjection to the embargo was the voluntary act of the carrier. It may be, as the argument on behalf of the respondent assumes, that entering the port of Norfolk was not voluntary, but was under the stress of necessity due to the condition of the vessel's pumps and the refusal of the crew to go into the war zone. We are of the opinion, however, that the burden of establishing these facts is upon the respondent. It is hampered by the death of the master of the schooner. The inability of the respondent to have the benefit of the testimony of the master is a misfortune, but this does not change the rules of law. There are no facts in the case from which the finding could be made that the visit of the schooner to the port of Norfolk was otherwise than voluntary. These findings lead to the conclusion that the respondent defaulted in its contract.

[5] This cause may be viewed in another light than that in which we have thus far viewed it. Assuming a contract of carriage and a breach by deviation, the right of the shipper is, as before stated, twofold. He may declare the breach and recover for his damages, or he may waive the breach and insist upon performance. If no breach be declared, and the carrier and shipper treat the contract as still existing, the contract remains in binding force as modified by the new situation. In the instant case, we would then have a contract of carriage made impossible of performance by the vis major of an embargo. In view of this justification, either party might declare the contract off; but if the contract be declared off by the carrier, as he has not performed, his right to annul the contract is conditioned upon the restoration of the shipper to the precontract situation. This means the return of prepaid freight, etc., and leads, in respect to the proper judgment to be entered, to the same conclusion before reached.

The damages, so far as proven, are as follows:

| | | |
|---|---:|---:|
| Freight paid in advance.. | | $46,995.84 |
| Insurance advanced...... | | 7,500.00 |
| Total ................. | | $54,495.84 |
| Marine insurance........ | $13,045.00 | |
| War risk.............. | 11,297.81 | |
| | $24,342.81 | |
| Return premium........ | 11,156.39 | 13,186.42 |
| Total .................. | | 67,682.26 |
| Interest ............... | | 32,835.90 |
| Total ................. | | $100,518.16 |

A decree entering judgment for this sum may be entered, with costs.