**CHARBONNIER et al. v. UNITED STATES.**
**UNITED STATES v. CHARBONNIER et al.**

No. 824.

District Court, E. D. South Carolina.

July 12, 1929.

Bigham, Englar, Jones & Houston, T. C.
Jones, and W. J. Nunnally, Jr., all of New

York City, and Alfred Huger (of Huger, Wilbur, Miller & Mouzon), of Charleston, S. C., for libelants and cross-respondents.

J. D. E. Meyer, U. S. Atty., of Charleston, S. C., and Burlingham, Veeder, Masten & Fearey, R. H. Hupper, and W. J. Dean, all of New York City, for respondent and cross-libelant.

ERNEST F. COCHRAN, District Judge.

These two suits arise out of a fire which happened on the Shipping Board steamer Pinellas at Charleston on the night of June 15, 1921, whereby her cargo of cotton was damaged by fire and by water used to extinguish the fire. The first suit is brought under the Suits in Admiralty Act (46 USCA §§ 741–752) by the owners of the cargo to recover from the United States the cargo damages. The second suit is a cross-libel brought by the United States against the cargo owners to recover salvage and general average contribution in respect to the sacrifices and expenses necessitated in the saving of the ship and cargo.

The case came on for hearing before me, and the witnesses L. C. Villenga, Henry W. Lockwood, and Thomas L. Stanley testified at the hearing for the libelants, and the witnesses J. M. Whitsitt, Robert S. Haight, William P. Kain, M. H. Winner, and R. M. Myatt testified for the respondent. At this hearing much documentary evidence was introduced. The testimony of the witnesses Henry E. Quenstadt, Frank W. Spencer, Herbert N. Fleetwood, J. J. Stegin, Frank J. Finster, Alfred E. Jordan, and M. W. Crockett, for the libelants, and of the witnesses Harry Miller and Patrick J. Purcell, for the respondent and cross-libelant, were taken by deposition, and the depositions read at the hearing.

For convenience, the libelants will hereafter be referred to as the cargo owners, and the respondent and cross-libelant as the shipowner.

To state the issues very briefly, the shipowner claims that inasmuch as the loss to the cargo occurred from fire, he is exempt from liability by virtue of the Fire Act, R. S. § 4282 (U. S. Code, title 46, § 182 [46 USCA § 182]); and that having exercised due diligence, under section 3 of the Harter Act (U. S. Code, title 46, § 192 [46 USCA § 192]), he is not responsible for damages from faults or errors in navigation or the management of the vessel. The shipowner also contends that by virtue of the "Jason Clause" in the bills of lading, he is entitled to salvage and general average contribution. The cargo owners claim that the fire was caused by neglect of the shipowner; that there was a deviation and the shipowner thereby became an insurer of the cargo. They also claim that because of the deviation and unseaworthiness of the ship, there is no liability for salvage and general average contribution. The testimony has taken a very wide range, and much evidence of experts has been offered. The learned counsel on both sides have argued the case orally and filed very full briefs with citations to numerous authorities. I shall not attempt to discuss all of the evidence in detail, nor discuss or cite the numerous cases that have been cited. It is sufficient to say that I have read the record and briefs very carefully and examined practically all of the cases cited.

In reference to the expert testimony, while in this particular case the experts who differed were not equal in number, nevertheless I think the following observations of the Supreme Court are pertinent and helpful in deciding upon the merits of conflicting expert testimony:

"It is difficult for a court to decide issues of fact upon which experts equal in number and standing differ flatly, and when their conclusions rest on estimates upon the correctness of which the court, without technical knowledge, cannot undertake to pass. In such cases, the court looks about for outstanding facts from which the lay mind can safely draw inferences as to the probabilities. The court is also aided by its judgment of the care and accuracy with which the contrasted experts respectively have determined the data upon which they base their conclusions. The experts called by Minnesota in this case seemed to us to use more specific and accurately ascertained data for their estimates than those for North Dakota, and this circumstance, as well as the more satisfactory reasons given, lead us to think that their conclusions are more to be depended on." North Dakota v. Minnesota, 263 U. S. 365, 385, 386, 44 S. Ct. 138, 143, 68 L. Ed. 342.

In addition to this, where an expert's conclusions are more in accord with the ordinary facts of nature as known to laymen, than those of an expert who has reached a different conclusion, I think the lay mind naturally inclines to the views of the expert whose conclusions are in accord with the ordinary course of natural events. In other words, if a layman's own observation of physical facts or the course of natural events would lead

him to a certain conclusion, and then the experts who have made a special study of the subject in all of its details reach that conclusion while other experts take a different view, it is, I think, but perfectly natural and indeed proper that the layman should adopt those views which coincide with his own experience and observations.

The Pinellas was built in 1920 by the Merrill-Stephens Shipbuilding Company, at Jacksonville, under, the inspection of the American Bureau of Shipping, and was by that Bureau classed as "A 1." At the time of the losses under consideration, she was operated for the Shipping Board by the Carolina Company, a corporation. She was an oil-burning steamship of the Submarine Boat Corporation type, of 3,850 tons gross. For the storage of her oil, she was equipped with certain tanks, and among them what was called the "deep tank." This tank was divided into two compartments, and into each compartment led a fueling pipe line and from each led a vent pipe line. The fueling and vent lines were of the same dimensions. The vent lines ran for a short distance vertically to an elbow, then horizontally for some distance, and then again vertically through the deck to a gooseneck.

Before the Pinellas entered upon the voyage which resulted in the fire, she had been laid up, but was put into service again at Savannah; and when her master joined her, she had no crew, the only person aboard being the watchman. Her cargo for the voyage was to consist of cotton and cotton-seed meal; and the bills of lading gave her the right to proceed to other ports to complete loading. The plan was to take on board cotton and cotton-seed meal at Savannah, proceed to Charleston and take on cotton there sufficient to complete the cargo, and then make the voyage to Liverpool. The bills of lading called for a voyage from Savannah to Liverpool, but with the privilege above mentioned. While loading at Savannah, a strike occurred and all the engineers left the ship, and she finished taking on the cargo at Savannah with no engineers aboard. All of her cargo was loaded at Savannah except 1,500 bales of cotton, which was later loaded at Charleston. As the ship had no power of her own, the owner arranged to have her towed from Savannah to Charleston by the tugboat Christabel. She left Savannah on May 31, 1921, in tow by the Christabel. She had a full crew with the exception of engineers. As she had no engineers aboard and of course no steam or power of her own, she

had to be steered by hand. In this situation, she ran aground in the Savannah river, but was soon gotten off, and I do not consider this grounding very serious. The progress to Charleston was slow, the Pinellas sheering frequently, and making it difficult to handle her, but she finally arrived off Charleston sea-buoy. Here her hawser became fouled in the Christabel's propeller, making it necessary to anchor the Pinellas. Inasmuch as the Pinellas had no steam, it became necessary to slip her anchor, and with the aid of the tug Cecilia, the Christabel succeeded in getting the ship into Charleston, where she was placed in a berth to take on her Charleston cargo. She there took on the 1,500 remaining bales, the loading being completed on June 3, 1921, and she was then towed to an anchorage in the Cooper river, and remained there at anchorage till June 15, 1921. On June 8, while the Pinellas was at anchor, the steamship Magmeric dragged her anchor and struck the stem of the Pinellas on the starboard. Later, the steamship Western Wave also dragged her anchor and struck the stem of the Pinellas a severe blow, the anchor cable of the Pinellas fouling the propeller of the Western Wave. The Western Wave swung around with the ebb tide, and remained alongside the Pinellas on her port side. The impact and weight of the Western Wave caused the Pinellas to drag her anchor about 30 feet. Later the same day, the tug Hilton made fast to the Magmeric, and in trying to get her back to her anchorage, she struck the starboard corner of the Pinellas. The only examination of the Pinellas was made above the water line and showed several small dents on the port side forward, and also a dent on the starboard side. No further examination was made to ascertain any damage to the Pinellas. About June 12, the strike ended, and the owners were then able to obtain the engineer crew, consisting of Patrick J. Purcell, chief engineer, his son J. H. Purcell, first assistant engineer, R. M. Myatt, second assistant engineer, and H. L. Campbell, third assistant engineer. The chief engineer, Patrick J. Purcell, had a chief engineer's license for vessels of the size of the Pinellas; but the first assistant engineer had only a third assistant's license. The log-book shows that on June 13, at 5:30 a. m., the chief and first assistant engineer came aboard. Practically at the same time, or very shortly thereafter, the other engineers joined the steamer. Myatt, the second assistant, joined on June 14. The fuel oil capacity of the Pinellas was about 8,200 barrels. On the afternoon of June 15, 1921, she was

towed to the Standard Oil dock for refueling. She had to be towed because her boilers had not been cleaned out and she had no steam of her own. There is some question as to how much fuel oil she had on board at this time. In answer to the interrogatories, the shipowner stated that the amount was 1,500 barrels, and it was conceded by counsel for the shipowner that the records of the Carolina Company would show this amount. The chief engineer, however, testified that the amount of fuel oil on board was not more than six tons, and that he had used that up the night before the fire to pump out the ship. The engineers had not been informed of the grounding in the Savannah river, nor of the collisions which occurred at Charleston, nor of the fact that the vent pipes to the deep tank were of the same size as the filling pipes, and that the fueling of the deep tank would require very careful handling. No information was given to the engineers of the quantity of oil which was on board the Pinellas, although Mr. Whitsitt, the agent for the Shipping Board at Charleston, conceded that the Carolina Company, of which he was president (and which was operating the vessel for the Shipping Board), had such information in its possession. The refueling was in charge of Myatt, second assistant engineer. It appears from the testimony of Villenga, the dockmaster for the Standard Oil ·Company, that there were numerous interruptions to the fueling, and the impression made upon his mind was that the engineers did not understand the lines of the ship. At the time of the refueling, the ship's dynamos were not operating, and no electric lights were in use, but lanterns were being used, and there was a lantern in the engine or fire room for the observation of the gauges. The evidence also shows very clearly that the smoke uptakes in the boiler room were red hot, or certainly hot enough to ignite an inflammable substance like oil, or oil spray, that might come in contact with them. The chief engineer admitted in his testimony that the uptakes were red hot. The refueling was done by pumping from the Standard Oil line, a distance of approximately a mile, and the oil had been heated in order that it might be more easily pumped. After the refueling had proceeded for several hours and while the deep tank was being topped off, a fire broke out in the ship and did great damage to the cargo and also to the ship. In answer to the interrogatories, the shipowner stated that at the time the fire occurred, the Pinellas had received 4,903.84 net barrels of fuel oil; but the shipowner's counsel, in his brief, stated the amount as 5,035 barrels. After the fire, the deep tank was found to be full of fuel oil, but it showed signs of having been subjected to strong internal pressure. It was found also that an elbow in the fueling line to the deep tank was fractured.

The experts who testified for the cargo owners were of opinion that the vents to the deep tank were not of sufficient size and were improperly constructed also in running horizontally and having right-angled bends, when they should have been upright or at an angle not exceeding 30 degrees; and that in the topping off of the deep tank it became full and the vents could not relieve the pressure; in consequence of which the elbow in the fueling line to the deep tank in the vicinity of the boiler room burst, and allowed the oil, or spray of oil, to come in contact with the red hot uptakes or with the lantern in the engine room, or both, and this caused the fire. The chief engineer himself admitted that the fire was caused by the bursting of the elbow, due to excessive pressure; though he claimed that this was due to the failure of the dockmaster to cut off the pumping when he was notified to do so. I am satisfied, however, that the dockmaster did not fail in this respect; in fact, he himself voluntarily cut off the pumps on hearing a splash of oil, and this occurred a few minutes before the fire was observed.

Without going into the reasoning of the experts and details of the evidence in this respect, I have come to the conclusion that the experts for the cargo owners are correct, and that the fire was caused as testified to by them.

The rule of the American Bureau of Shipping which was in effect at the time of the fire and at the time the Pinellas was built was as follows:

"Vent pipes are to be fitted at the highest part of the tank top and at the corners; the total area of the pipes should be at least twice that of the supply pipes, and every precaution is to be taken by punching airholes, etc., to prevent the risk of airlocks in any part of the tank; inspection plugs should be accessible at all times when the tank is full and should be left off when filling tank."

The deep tank did not comply with this rule, and this important defect in construction was accentuated by the right-angled elbows and horizontal lead. The vents being defective and insufficient to take care of the pressure, when the tank became full, the strong pressure from the pumping resulted in the weakest part giving way, which hap-

pened to be the elbow in the vicinity of the boiler room, and oil sprayed therefrom and reached either the hot uptakes or the burning lantern, or both, and ignited, and the fire ensued. The neglect of the owners, therefore, was the proximate cause of or at least contributed as a proximate cause to, the fire.

The only witness who testified in support of any other theory of the cause of the fire was Captain Kain. His theory was that the fire was caused by oil which came out of another tank and ran through the vent on the port side of the ship near the fiddley door and then into the fiddley and thus found its way down into the fire room. This theory is supported only by the expert testimony of Captain Kain himself. It is not in accord with the testimony of the witnesses who testified as to the facts of the case. The evidence is convincing that the fire occurred while the deep tank was being filled. Captain Kain endeavored to support his theory by testifying that upon an examination of the ship after the fire, he found the valve to the deep tank closed and fused by the fire. No other witness substantiates him in this testimony. It is utterly irreconcilable with the fact of the case, which was that the deep tank was being actually filled at the time the fire occurred. Nor is Captain Kain's theory that the bursting of the elbow was due to its becoming hot and water being poured upon it at all convincing to my mind. There is too much other evidence which is undenied, which shows that there was a heavy internal pressure exerted on the deep tank; and I am convinced that the reasons assigned by those experts who testified that the bursting of the elbow was due to the pressure of the oil being forced into the deep tank with inadequate vents are more satisfactory than the reasons assigned by Captain Kain for the bursting of the elbow. It is true that Captain Kain personally examined the vessel after the fire, and Captain Stanley, one of the experts for the cargo owners, did not have that opportunity. But the other expert witnesses who testified as to the cause of the fire, and who differed from Captain Kain, did have as ample, if not better, opportunity, than Captain Kain; for they made their examination earlier after the fire than he did. Moreover, Captain Kain's examination appeared to be of a somewhat secretive nature; and while he was perhaps under no duty to make known what he had found and his views, nevertheless it is a matter for some consideration that he apparently did not call the attention of others at the time to the facts that

he says he discovered. While Captain Kain stated at the hearing that the insurance companies he represented had no further interest in the cause, nevertheless he did not testify that they had no interest at the time that he made his examination and reported to them. To my mind, Captain Kain's theory cannot be reconciled with the facts of the case as I have found them.

The shipowner's counsel has made some criticism upon Captain Stanley to the effect that he appeared to be more of an advocate than a witness. It is true that Captain Stanley was very positive in much of his testimony, and exhibited a very firm conviction in the correctness of his views. But he did not impress me with the idea that he was too earnest in their presentation. The impression that he made upon me was that he had had a great deal of experience in the building of ships, and felt very firmly convinced that he was correct in his line of reasoning and the conclusions he had reached. I did not observe anything in his conduct which would impress me with the idea that he was not sincere. It is true that he testified merely as an expert and did not have the opportunity of a personal examination of the vessel after the fire; but his views are supported by the evidence of experts who did have that advantage.

The shipowner contends, however, that even if Captain Kain's theory of the fire is not correct, nevertheless the burden is not upon the shipowner to show how the fire was caused; and that the fact that they cannot show how it was caused does not prove that it was caused in the manner claimed by the cargo owners, and that the cause of the fire is really a matter of pure speculation. It is true that the burden under the Fire Statute is not upon the shipowner to show the cause of the fire; and it is also true that the fact that he did not show the cause does not show that it was caused in the way the cargo owners claim; and it is also true that if the proof leaves the matter purely one of speculation as to the origin of the fire, the Fire Statute (46 USCA § 182) prevents a recovery by the cargo owners. But in the present case, I do not think the matter is left to speculation. There is positive testimony here of facts from which it can be inferred that the fire was caused in the manner that the expert witnesses for the cargo owners say it was; experts have testified that in their opinion it was caused as I have already stated; and the fact that there is no other reasonable cause assigned for the fire is at least

a matter for some consideration. In other words, trustworthy and reliable witnesses and experts have given positive testimony as to the cause of the fire, and no other satisfactory cause has been shown. I think, therefore, that it is not a matter of speculation at all, but there is sufficient proof upon which to base a conclusion.

Without commenting further upon the evidence of the various witnesses, or discussing the various points raised by the counsel in the cause, upon a consideration of the whole case, I am satisfied that the cause of the fire arose from the personal neglect of the shipowner.

In addition to this, I have reluctantly come to the conclusion that the chief engineer was not competent and that his incompetence contributed in some measure to the fire. It is true that he had a chief's license for vessels of the size of the Pinellas; but it appears that he had never been to sea on an oil-burning steamer, and his license had only been issued to him about a year beforehand, and he had not acted as a chief engineer until he took that position on the Pinellas. The impression he made upon every one with whom he came in contact during the fueling and after the fire, who testified in the cause, was that he was incompetent, and they so testified. Shortly after the fire, he was discharged for incompetence and drinking. It is true that he was shortly thereafter reinstated, and it appears that since then he has had considerable experience, and apparently been a satisfactory officer. He did not take charge himself of the fueling, and the testimony is that the chief himself should take the personal direction and charge of the fueling of a ship like the Pinellas. While he testified that he had familiarized himself with the pipe lines, yet after the fire he did not appear to understand them. His deposition was taken in New York City on January 4, 1929. While I would not profess to be able to form an absolute opinion as to the competence of the engineer by having his testimony taken before me, nevertheless it would have been of some assistance if his evidence could have been taken at the hearing, instead of by deposition. The hearing was before me on January 9, 1929, at Charleston, and in a case of this importance it is regrettable that he was not summoned to Charleston to testify at the trial of the cause, instead of merely taking his deposition. However, I may say that from the reading of his deposition he appears, to say the least, to have been a rather peculiar and erratic man, and this

much is practically conceded. While I do not wish to do any injustice to an officer, or make any comment that would be disadvantageous to him in his future career, nevertheless, taking into consideration all of the testimony and circumstances surrounding the transaction, I am impressed with the view that, however skilled and competent he may have become in the years that have elapsed since this fire occurred, at that time he was not up to the mark or competent for the position of chief engineer on this vessel. It is worthy of observation that Mr. Whitsitt, the president of the Carolina Company, which was operating the Pinellas for the Shipping Board (the shipowner), employed the chief engineer; but it appears from Mr. Whitsitt's testimony that he only talked to him in the first instance and formed some opinion, but sent him to the marine superintendent; and upon the marine superintendent's report, the chief engineer was employed. Mr. Whitsitt testified in substance from the subsequent conduct of the chief engineer he formed an opinion that he was incompetent. It is significant that although the shipowner knew that the chief engineer's competence was under fire, the marine superintendent was not called as a witness, and we are left completely in the dark as to what efforts were made by him or any others to ascertain whether the chief engineer was competent. Whether the marine superintendent employed him because he thought he was competent or because of some exigencies growing out of the strike situation, we do not know; and the only witness who could have told us has not been produced, nor his absence accounted for. If the chief engineer had been competent and had personally taken charge of the fueling, as it was his duty to do, the undue pressure upon the deep tank might have been avoided, and despite the inadequacy of the vents, the elbow might have withstood the pressure and the fire been avoided. I think therefore his incompetence was at least a contributing cause of the fire.

In reference to the sounding pipes, the cargo owners apparently contend that the deep tank was not intended originally for an oil tank, and that it had no sounding pipes. There was testimony tending to show that the deep tank did have sounding pipes. The first plans of the ship produced do not clearly show that there were sounding pipes, and last plans that were produced were not clearly proven to be authentic plans. On the matter of the sounding pipes, the testimony on both sides seems to me rather vague. How-

172

ever, I shall assume that the deep tank did have sounding pipes, though I must say there is some doubt about it.

The cargo owners have alleged numerous other defects rendering the vessel unseaworthy, and some of the points appear to be well taken; but I have not thought it necessary to deal with all of those alleged defects in detail. The facts I have found above are sufficient, in my judgment, to dispose of the case under the law.

The Fire Statute, under which the shipowner claims an exemption from liability (R. S. § 4282, U. S. Code, title 46, § 182 [46 USCA § 182]), is as follows:

"No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

There is no claim here that there was any design on the part of the shipowner, but the case for the cargo owners is based entirely on neglect.

■ The neglect contemplated by the Fire Statute is not that of an agent, employee, or servant of the shipowner, but the shipowner's own personal neglect. Walker v. Transportation Co., 3 Wall. 150, 153, 18 L. Ed. 172.

■ And where the personal neglect of the owner has contributed to the loss, the Fire Statute does not apply. Walker v. Transportation Co., supra; Bank Line v. Porter (C. C. A. 4th) 25 F.(2d) 843, 846.

■ The failure to provide a seaworthy vessel or competent crew is the personal neglect of the shipowner, and debars him from the benefit of the Fire Statute. Bank Line v. Porter, supra.

■ The proximate cause is the dominant cause, not the one which is incidental to that cause, its mere instrument, though the latter may be nearest in place and time to the loss. The G. R. Booth, 171 U. S. 450, 457, 458, 19 S. Ct. 9, 43 L. Ed. 234.

In the present case, the dominant cause of the fire was the personal negligence of the shipowner in failing to provide a seaworthy ship and competent crew. The G. R. Booth, supra.

The shipowner therefore cannot claim exemption from liability under the Fire Statute.

But the cargo owners also contend that the shipowner is liable for damages on the ground that there was a deviation, and that the shipowner thereby became the insurer of the cargo, or at least the burden was cast upon him of showing that the loss would have occurred if there had been no deviation, which has not been shown in this case.

■■ The term "deviation" does not at the present day have the limited meaning that would ordinarily be suggested of a mere change in the route of a vessel, but it has a more varied meaning and wider significance. It was originally employed no doubt for the purpose its lexicographical definition implies, namely, to express the wandering or straying of a vessel from the customary course of the voyage; but it seems now to comprehend in general every conduct of a ship or other vessel used in commerce tending to vary or increase the risk incident to the shipment. It comprehends any voluntary act of the shipowner, or voluntary departure from the usual course, without necessity or any reasonable cause, which increases or changes the risk in the shipment; and when such deviation occurs, the shipowner becomes liable as an insurer, or at least the burden is cast upon him to show that the loss would have occurred if there had been no deviation. St. John N. F. Shipping Corporation v. S. A. Companhia Geral Commercial do Rio de Janerio, 263 U. S. 119, 44 S. Ct. 30, 68 L. Ed. 201; The Willdomino v. Citro Chemical Co., 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491; The Willdomino (C. C. A. 3rd) 300 F. 5; The Sarnia (C. C. A.) 278 F. 459; The Indrapura (D. C.) 171 F. 929.

■ For a vessel to be towed without justifiable cause or excuse constitutes a deviation. The Indrapura (D. C.) 171 F. 929, 932, and cases therein cited. It has also been held that a deviation deprives the shipowner of the benefit of the Fire Statute. The Indrapura, supra, 171 F. page 938.

Bills of lading, however, usually contain provisions permitting certain deviations, and the provision in the bills in the present case is as follows:

"It is mutually agreed, that the ship shall have liberty to sail without pilots, to tow and assist vessels in distress, to deviate for the purpose of saving life or property; also to call at any port or ports in or out of the customary route in any order, to land and/or receive goods and/or passengers; that the carrier shall have the liberty to convey goods in lighters to and from the ship at the risk of the owners of the goods; and in case the

ship shall put into a port of refuge or be prevented from any cause from proceeding in the ordinary course of her voyage, or should the goods or part of them be shut out from such steamship, the owners or agents have the privilege to tranship the goods to their destination by any other steamship or steamships at the shipper's risk."

■ This clause, it is to be observed, permitted the Pinellas to tow other vessels in distress, but no permission is given for the Pinellas to be towed. The testimony conclusively shows that the towage of a steamer like the Pinellas from Savannah to Charleston was unheard of, except in the case of distress or emergency; and that the towage rendered the voyage more hazardous than it would otherwise have been. When the shipowners permitted the Pinellas, without any steam or power of her own, without any engineer crew aboard, to be towed from Savannah to Charleston, steered by hand, there was undoubtedly a departure from the usual course which seriously increased the risk, and I think constituted such a deviation as made the shipowner an insurer, certainly of all that part of the cargo (which was the greater part) that was loaded at Savannah.

■ It is argued, however, on behalf of the shipowner that the existence of the strike furnished sufficient ground for the deviation in question. I cannot accede to this proposition. The strike had already begun before the shipowner undertook to tow the Pinellas to Charleston. It was the duty of the shipowner to furnish a seaworthy vessel and obtain a crew at the outset of the voyage. The Carib Prince, 170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181; The Caledonia, 157 U. S. 124, 134, 15 S. Ct. 537, 39 L. Ed. 644; The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; The Willdomino v. Citro Chemical Co., 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491; Pendleton v. Benner Line, 246 U. S. 353, 38 S. Ct. 330, 62 L. Ed. 770; The Maine (D. C.) 8 F.(2d) 291. See also The Henry W. Cramp (D. C.) 6 F.(2d) 900; and Id. (C. C. A.) 20 F.(2d) 320.

The question whether the existence of the strike would have excused the shipowner from commencing the voyage until he would secure a competent crew is not now before the court for decision. The shipowner voluntarily undertook the commencement of the voyage and did not provide a seaworthy vessel or a competent crew as it was his duty to do.

But so far as the 1,500 bales of cotton loaded at Charleston is concerned, it does not seem to me that the towing of the vessel from Savannah to Charleston can be deemed a deviation. But it is not necessary to decide the question, for even when that portion of the cargo was loaded at Charleston, the vessel was not seaworthy, she did not have any engineer's crew aboard, and in that condition, after loading the 1,500 bales, she was taken from her berth and anchored in the stream and remained there from June 3 until June 15, 1921, and the shipowner must be held liable for the damages to the 1,500 bales on those grounds.

The shipowner relies also for exemption upon section 3 of the Harter Act (U. S. Code, title 46, § 192 [46 USCA § 192]). That section provides in substance that if the shipowner shall exercise due diligence to make the vessel in all respects seaworthy and properly manned, etc., he will not be held responsible for damage or loss resulting from faults or errors in navigation or in the management of the vessel, etc.

■ The burden is on the shipowner setting up exemption from liability under the third section of the Harter Act to prove that he exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied. The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830.

■ The shipowner in this case has not carried the burden of showing that he exercised due diligence to make the ship seaworthy and properly manned. On the contrary, the evidence shows that he failed to make the ship seaworthy; that she was not properly manned, and the proximate cause of the fire was this personal neglect of the shipowner. Therefore, in no aspect of the case can the shipowner be relieved under section 3 of the Harter Act.

■ We come now to the question whether the shipowner is entitled to general average contribution as claimed in the cross-libel. It is conceded that in the absence of contract the shipowner would not be entitled to general average contribution. The Irrawaddy, 171 U. S. 187, 18 S. Ct. 831, 43 L. Ed. 130.

But in the Jason Case, the Supreme Court held that a general average agreement inserted in the bills of lading providing that if the owner of the ship shall have exercised due diligence to make the ship in all respects seaworthy and properly manned, equipped,

and supplied, the cargo shall contribute in general average with the shipowner, even if the loss resulted from negligence in the navigation of the ship, is valid under the Harter Act, and entitled the shipowner to claim general average contribution from the cargo owners in respect to sacrifices made and extraordinary expenditures incurred by him for the common benefit and safety of the ship and cargo. The Jason, 225 U. S. 32, 32 S. Ct. 560, 56 L. Ed. 969.

Since the latter decision, shipowners have generally placed in the bills of lading what is known as the "Jason clause." It is contained in all the bills of lading in the present case, and is as follows:

"General average shall be settled at New York according to York-Antwerp rules of 1890, and as to the matter not therein provided for, according to the law and usage at the port of New York. *If the shipowner shall have exercised due diligence to make the vessel in all respects seaworthy and to have her properly manned, equipped and supplied,* it is hereby agreed that in case of danger, damage or disaster resulting from accident or from default or error in navigation or in the management of the vessel or from any latent or other defect in the vessel; her machinery and appurtenances, or from unseaworthiness, although existing at the time of shipment, or at the beginning of the voyage (provided the defect or unseaworthiness was not discoverable by the exercise of due diligence) the shippers, consignees or owners of the cargo, shall nevertheless pay salvage and any special charges incurred in respect of the cargo and shall contribute with the shipowners in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred for the common benefit or to relieve the adventure from any common peril." (Italics mine.)

Under the Jason clause, the shipowner is entitled to general average only when he shall have exercised due diligence, etc. The shipowner here has wholly failed to meet this condition. The ship was not seaworthy; was not properly manned; she had improper vents for her tanks; and numerous other defects; and this condition was due to the personal neglect of the shipowner. The shipowner therefore cannot claim general average contribution.

For the reasons stated, the cargo owners are entitled under their libel to recover from the shipowner the damages sustained by their respective cargoes, and the shipowner is not entitled under the cross-libel to general average contribution.

Let the proctors for the libelants prepare a decree in accordance with the foregoing opinion, serve a copy thereof upon the proctors for the respondent and cross-libelant, and submit the same to the court for signature upon four days' notice.