66 F.2d 75 (1933)
THE PELOTAS.
COMPANHIA DE NAVEGACAO LLOYD BRASILEIRO
v.
DAVID G. EVANS COFFEE CO. et al.
No. 6564.
Circuit Court of Appeals, Fifth Circuit.
July 12, 1933.
Rehearing Denied September 7, 1933.
John D. Grace and M. A. Grace, both of New Orleans, La., for appellant.
Henry P. Dart, Jr., of New Orleans, La., and D. Roger Englar and Henry N. Longley, both of New York City, for appellees.
Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.
*76 BRYAN, Circuit Judge.
The owner of the steamship Pelotas appeals from a decree denying its petition for exoneration, or, in the alternative, for limitation of liability, in respect of loss or damage to cargo resulting from the stranding of that ship, and sustaining a claim of the cargo owners, about 40 in number, that, because of unwarranted deviations with its privity and knowledge, the shipowner was liable for the full amount of such loss and damage. The cargo owners, before the petition was filed, had instituted libel suits, both in rem and in personam, claiming possession of such part of the cargo as had been saved, and damages for such parts of it as had been lost or injured. Pursuant to the 51st Admiralty Rule (28 USCA § 723), they filed in this limitation proceeding the claims that with the privity and knowledge of her owner the Pelotas (1) had without lawful excuse deviated from the usual and customary route, and (2) was unseaworthy mainly because she did not have on board a detail chart of the port at the entrance to which the stranding occurred. The District Court, having sustained the claim of deviation, did not consider it necessary to pass upon the claim of unseaworthiness. The Pelotas, 43 F.(2d) 571. The opinion also disposes of a claim for salvage which will not be considered here, since there is no assignment of error relating to it.
In support of the assignments of error, two principal contentions are made. The first is that the cargo owners are not entitled to rely on their claims of deviation, because, by filing their libels and claiming possession of such part of the cargo as was delivered and damages for that part which was not delivered, they made an irrevocable election to affirm and enforce the contract of carriage evidenced by the bills of lading. The second is that there was no deviation, because the route taken by the Pelotas was authorized by a clause of the bills of lading. A contention of less consequence, though of considerable importance, is that some of the shippers, among them the largest one, had actual knowledge of an intention on the part of the owner to have the master follow the route that was actually taken, and hence that such shippers and their consignees are in any event estopped to rely on deviation as the basis of their claims for damages.
The Pelotas accepted at the Brazilian ports of Santos, Rio de Janeiro, and Victoria approximately 66,000 bags of coffee consigned to merchants at New Orleans. The bills of lading for the coffee declared that the vessel intended to sail for and to transport the coffee to New Orleans, there to be delivered to the order of the consignees. Clause 2, which comes after that declaration, provides: "If through any eventuality caused by heavy weather or any other case of force beyond control, through circumstances arising from the operations of steamers carrying mail, or through delay of the consignees of the cargo, it should not be possible to effect the discharge of the merchandise at the port of destination and within the time scheduled for the stay of the mail steamer, the Master is authorized to proceed, according to his itinerary and ports of call, the cargo being returned to destination by the same or another steamer, without the shipper or consignee being entitled to any indemnity for the delay. The merchandise that through any circumstance should not be discharged at the port of destination, may be taken to the nearest or another convenient port, and then reshipped to the said port, * * * but at the risk of the merchandise, or may be delivered on the return trip of the steamer." Those bills of lading named no port or destination other than New Orleans. Notwithstanding this, however, and although the major part of the cargo was coffee, two additional shipments were accepted, one of shoes for transportation to La Guaira, Venezuela, and the other of 200 head of cattle for transportation to Vera Cruz, Mexico. The Pelotas, after leaving Victoria, the last Brazilian port, proceeded first to La Guaira, and afterwards while approaching Vera Cruz at night stranded on a reef, and was so badly damaged that she was unable to proceed further with her cargo. As a result of the stranding sea water entered the holds of the vessel, rendered a large part of the coffee worthless, and seriously damaged much of the remainder. Such part as was undamaged, or was considered of sufficient value, was transferred from the Pelotas to another vessel and carried to destination. It is undisputed, indeed it is alleged in the petition, that the Pelotas proceeded to La Guaira and to Vera Cruz under her owner's written order. The usual or customary route from Brazilian ports to New Orleans is by Point Galera, Trinidad, through the Caribbean Sea, north of the Island of Jamaica, by the Grand Cayman to a point off Cape San Antonio, Cuba, in the Yucatan Channel, and then direct to the mouth of the Mississippi river. Prior to the beginning of this voyage none of appellant's vessels had ever called at La Guaira or Vera Cruz while en route to New Orleans. Out of a total of 155 ships entering New Orleans from Brazilian ports *77 during the three-year period immediately preceding the stranding of the Pelotas, not one had put in either at La Guaira or Vera Cruz. The Pelotas left the customary route to New Orleans at Point Galera, skirted the northern coast of Venezuela to La Guaira, and, after traveling an extra distance of 100 miles, returned to the customary route near the Island of Jamaica and proceeded on that route to Grand Cayman, where it again turned off, passed through the Yucatan Channel, and proceeded to the point where it stranded at the entrance to the harbor of Vera Cruz. The distance from Cape San Antonio around by Vera Cruz is longer by nearly 900 miles than the direct route to New Orleans. No shipper under these bills of lading consigned the coffee to himself; but in every instance the consignment was to an American buyer. As soon as they received their bills of lading, the shippers attached them to drafts on the buyers, and received the amounts of the drafts upon letters of credit. There is no evidence that any consignee or his assignee had actual knowledge of the route to be taken by the Pelotas. Some of the shippers testified, over objection of the cargo owners, that before or at the time they accepted the bills of lading they knew it was the intention of the master or owner of the Pelotas to call at La Guaira and Vera Cruz on the way to New Orleans. Appellant attempted to prove that the largest shipper, who received bills of lading calling for 25,000 bags of coffee, was the agent of the consignee and knew that the Pelotas intended to call at Vera Cruz, but there was no attempt to prove that shipper's knowledge that the ship also intended to call at La Guaira. The witness Benn, who gave testimony to this effect, admitted that he himself had no knowledge on the subject, but was merely repeating what he had been told by some one else.
A shipowner cannot claim limitation of liability if he orders his ship to deviate. 46 USCA § 183. For the purposes of this case deviation may be defined to be "a voluntary departure, without necessity or reasonable cause, from the regular and usual course." Hostetter v. Park, 137 U. S. 30, 40, 11 S. Ct. 1, 4, 34 L. Ed. 568; Constable v. National Steamship Co., 154 U. S. 51, 66, 14 S. Ct. 1062, 38 L. Ed. 903. A bill of lading which does not permit liberty of deviation, as these bills of lading do not, implies that the carrier will take the goods to destination by the usual and customary route; and so it need not expressly declare what the route is. Leduc v. Ward, 20 Q. B. 475; Smith v. U. S. Shipping Board (D. C.) 2 F.(2d) 390; The Frederick Luckenbach (D. C.) 15 F.(2d) 241; Carver on Carriage of Goods by Sea § 285.
It is not open to serious question, indeed it is in effect admitted, that the Pelotas departed from the regular route of ships proceeding on voyages from the Brazilian ports to New Orleans, and that she was guilty of wrongful deviations unless the bills of lading held by appellees gave permission to call at the ports of La Guaira and Vera Cruz. Appellees, the cargo owners, were not precluded from claiming deviations by reason of the fact that they had claimed possession of the coffee that was delivered at destination and had filed libels seeking recovery of damages sustained by them because of coffee lost or destroyed or damaged. They had the right to accept the goods or such part of them as could be delivered, and hold the ship and the owner of it who had ordered a deviation responsible for breach of contract. The Delaware, 14 Wall. 579, 605, 20 L. Ed. 779; The Willdomino, 272 U. S. 718, 725, 47 S. Ct. 261, 71 L. Ed. 491. Of course they could not repudiate the contract and sue for conversion, and at the same time cling to the contract and insist upon performance of it. Nor have they attempted to do so; they have elected to affirm the contract and claim damages for its breach. Upon the exercise by appellees of their right to sue on the contract, the shipowner, having ordered the deviation, and therefore not being entitled to claim limitation of liability, became liable as an insurer; and so it becomes immaterial to inquire whether the goods were lost or damaged because of the unseaworthiness of the ship, errors of navigation, perils of the sea, or other exceptions from liability declared in the bills of lading. Leduc v. Ward, supra, at page 484 of 20 Q. B.; The Citta Di Messina (D. C.) 169 F. 472; The Sarnia (C. C. A.) 278 F. 459, 464. We do not understand The Henry W. Cramp (D. C.) 6 F.(2d) 900, relied on by appellant, to announce a different rule; but, if it does, it was reversed in so far as it held that suit on the contract waived a deviation, Id. (C. C. A.) 20 F.(2d) 320, and is, in our opinion, contrary to the great weight of authority. In Sidney Blumenthal & Co. v. United States (D. C.) 21 F.(2d) 798, also relied on by appellant, it is said, it is true, that the effect of deviation is to abrogate the contract and give the shipper an action for conversion, but it is also said that after deviation the shipper has the option to hold to the contract or to regard it as abrogated.
In support of its second main contention, that the Pelotas did not deviate but followed *78 the route declared in the bills of lading, appellant relies solely on clause 2, above quoted, concerning the master's authority to proceed with the voyage "according to his itinerary and ports of call." The argument is that the owner's written order to call at the ports of La Guaira and Vera Cruz was incorporated in the bills of lading by reference, with the result that constructive notice was given of the voyage intended to be undertaken. The bills of lading in the first place named the port of destination, and then afterwards in clause 2 provided that, if by reason of heavy weather or other enumerated causes it should be impossible to discharge cargo at the port of destination, the master should be authorized to proceed according to his itinerary and ports of call. It seems clear to us that, until the ship arrived at the first port of destination named in the bills of lading, the question of the authority of the master to proceed to other ports could not arise. As in this case New Orleans was the only port of destination thus named, the ship was bound to proceed there, and the master was without authority to go to any other port for the purpose of delivering cargo until after it had become impossible by reason of one or more of the enumerated causes to discharge cargo at New Orleans. In our opinion clause 2 refers to the port of destination, the itinerary, and the ports of call shown by the bills of lading themselves, and not to some or any other port of destination or call, or itinerary designated in orders issued by the owner. To give that clause the construction contended for by appellant would be to authorize the shipowner to order any deviation at will so long as he did it in writing, and would deprive the holder of a bill of lading or owner of cargo of the undoubted right to insist that the vessel proceed according to contract to the port of destination. Such a construction is clearly untenable.
None of the shippers agreed even orally that the Pelotas should call at La Guaira or Vera Cruz. It is only claimed by appellant that some of them before the bills of lading were issued had knowledge of an intention on the part of the master or the shipowner to deliver cargo at those ports. If positive agreements had been made for such deliveries, clearly proof of them would have been inadmissible under the parol evidence rule. The Delaware, supra. If such an agreement is only implied by knowledge on the theory that silence gives consent, proof of such knowledge would not make out a stronger case than proof of a positive agreement. In the one case as in the other, the undertaking is at last to vary a written instrument by parol. 1 Greenleaf, § 275; 4 Wigmore, § 2471. In Sproat v. Donnell, 26 Me. 187, 45 Am. Dec. 103, knowledge of the shipper that his goods were stowed on deck was held inadmissible to contradict a clean bill of lading, the legal import of which was that the goods would be stowed underdeck; and this ruling was cited with apparent approval by the Supreme Court in The Delaware, supra. The rule which permits evidence of the facts and circumstances under which a contract that is ambiguous was entered into is not applicable here, because these bills of lading under any view are not ambiguous. As in our opinion the evidence offered for the purpose of showing that some of the shippers had knowledge of the intention of the Pelotas to call at La Guaira or Vera Cruz was inadmissible even against them, it becomes unnecessary to inquire whether such knowledge as the shippers had could be imputed to the holders of order bills of lading.
For the reason that, in our view, the Pelotas was guilty of the deviations claimed by the appellees, we consider it unnecessary in advance of a decision by the District Judge to pass upon the question of unseaworthiness.
The decree is affirmed.
SIBLEY, Circuit Judge (concurring).
As to the last paragraph of the opinion I agree with the result reached but not with the ground of decision. Leduc v. Ward, 20 Q. B. Div. 475, was exactly like this case, in that the goods were delivered to the ship in fulfillment of contracts for their sale by the shipper to the consignee, the shipper taking out bills of lading to the order of the consignee and attaching them to drafts on which he collected the purchase money. As against the consignee who paid the drafts on the faith of the bills of lading, it was held that the ship could not prove that the shipper knew of, and impliedly consented to, a deviation from the usual route which the language of the bills of lading imported. The case is good authority for holding that innocent purchasers of order bills intended to be negotiated may rely on their terms. A carrier is often estopped to dispute the terms of such bills as against an innocent transferee when he might have done so as against the shipper himself. Thomas v. A. C. L. R. Co., 85 S. C. 537, 64 S. E. 220, 67 S. E. 908, 21 Ann. Cas. 223, 34 L. R. A. (N. S.) 1177 and Note; Louisville & N. R. R. Co. v. Pferdmenges, Preyer & Co., *79 8 Ga. App. 81, 68 S. E. 617; The Lady Franklin, 8 Wall. 325, 19 L. Ed. 455. All save one of the consignees here involved were purchasers without proven notice of the bills of lading through local banks who honored the attached drafts because of credit arrangements made by the consignee. They come within the ruling in Leduc v. Ward.
One consignee was also shipper through a Brazilian agent whose knowledge at the time of shipment would affect his principal. This agent has in writing admitted to the shipowner that he knew that the ship was bound for New Orleans by Vera Cruz. But the admission was made a year after the event and after the insurers of the cargo had settled with this consignee and had become subrogated to his rights against the shipowner. The agent not appearing to have authority to adjust for the consignee, he could not bind his principal by ex post facto admissions. La Abra Silver Mining Co. v. United States, 175 U. S. at pages 498, 499, 20 S. Ct. 168, 44 L. Ed. 223; American Insurance Union v. Lowry (C. C. A.) 62 F.(2d) 209. Much less could he bind the insurers whose agent he had never been. No other proof of knowledge by this consignee of the ship's voyage appears. There is therefore no occasion to decide what would be the effect of knowledge if a consignee who had such knowledge was before us. These bills define the voyage of the Pelotas only by the words: "Destined to sail for New Orleans." I incline to think that it would be no violation of the parol evidence rule to prove the extrinsic facts that at the time the bills were issued she was already bound by her sailing orders, by her clearance and health papers, by advertising in the local newspapers, and by actual reception of freight and passengers for La Guaira and Vera Cruz to call at those ports on her way to New Orleans, and that the shipper knew it. If this were the truth, it would be absurd for the law to imply from the silence of the bills as to the route that the parties intended the usual direct passage; that they were making a contract which both knew would be at once broken. Thus silence as to the rate of freight is usually supplied by a legal implication for a reasonable charge which cannot be overridden by parol proof of an agreed rate, Louisville, Evansville & St. Louis R. Co. v. Wilson, 119 Ind. 352, 21 N. E. 341, 4 L. R. A. 244, but legal implications as to freight may be overridden by proof of the fact that a particular charge was indeed paid, Wayland's Adm'r v. Mosely, 5 Ala. 430, 39 Am. Dec. 335. It may be shown by parol that an insurer and insured both knew the house mentioned in the policy to be in course of construction in order to prevent application of the vacancy clause. Harris v. North American Insurance Co., 190 Mass. 361, 77 N. E. 493, 4 L. R. A. (N. S.) 1137. In the cases of The Delaware, 14 Wall. 579, 20 L. Ed. 779, and The Sarnia (C. C. A.) 278 F. 459, where a clean bill of lading was held to imply stowage underdeck, I apprehend the result might have been different if the specified vessel had been a barge without decks and so well-known to both parties. The case of Sproat v. Donnell, 26 Me. 187, 45 Am. Dec. 103, has been misunderstood in the opinion, for the court there denied that the bill of lading was breached by abovedeck stowage partly on the ground of usage, but adding: "More especially such would be the case where as in this case the shipper repeatedly saw his cargo stowed on deck and intimated no objection on that account." That knowledge by the shipper at the time of shipment that the vessel was bound on a voyage other than the usual one to the destination of the goods shipped would prevent a claim of deviation is recognized in Thatcher v. McCulloh, Fed. Cas. No. 13862; The Frederick Luckenbach (D. C.) 15 F. (2d) 241; Grace & Co. v. Toyo Kisen (C. C. A.) 12 F.(2d) 519, and General Hide & Skin Corporation v. United States (D. C.) 24 F.(2d) 736. I am not prepared to hold that shippers who wrote their own bills of lading as these did, if they had full knowledge at the time that the ship was bound to go by Vera Cruz, would not be estopped to claim deviation.